*This opinion is subject to revision before final
publication in the Pacific Reporter.*

**2014 UT 24**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

UTAH DEPARTMENT OF TRANSPORTATION,
*Appellee and Plaintiff,*

*v.*

MICHAEL M. CARLSON, JENNIFER CARLSON, JOSEPH SCOVIL, SALT
LAKE COUNTY, a political subdivision of the State of Utah, and
JOHN DOES I-IV,
*Appellants and Defendants.*

No. 20120414
Filed June 24, 2014

Third District, Salt Lake
The Honorable Todd M. Shaughnessy
No. 100901716

Attorneys:

Sean D. Reyes, Att'y Gen., Nancy L. Kemp, Asst. Att'y Gen.,
Salt Lake City, for appellee

Paul C. Drecksel, Justin P. Matkin, Salt Lake City, for appellants

JUSTICE LEE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING,
JUSTICE PARRISH, and JUDGE ORME joined.

Having recused herself, JUSTICE DURHAM did not participate
herein; JUDGE ORME sat.

JUSTICE LEE, opinion of the court:

¶1   This case presents the question whether the Utah Department of Transportation (UDOT) has the authority to use the power of eminent domain to condemn private property in excess of that needed for a transportation project. The condemnation at issue involved a fifteen-acre parcel owned by Michael Carlson. UDOT condemned the whole parcel despite the fact that it needed only 1.2 acres for its planned project. In so doing, UDOT asserted

an interest in avoiding litigation regarding Carlson's severance damages, citing Utah Code section 72-5-113 as the basis for its taking.

¶2    In the district court and on appeal, the parties' arguments have focused primarily on a statutory aspect of the question presented—whether section 113 authorizes UDOT's condemnation of excess property. Carlson has also proffered alternative, constitutional grounds for questioning UDOT's authority. Specifically, he advocates for his interpretation of the statute on constitutional avoidance grounds, and asserts that in any event UDOT's taking fails for lack of a "public use" as required under the Takings Clause of the Utah or U.S. Constitution. UTAH CONST. art. 1, § 22; U.S. CONST. amend. V.

¶3    The district court ruled in UDOT's favor, but without expressly addressing the constitutional question. Thus, it granted summary judgment for UDOT based on an express agreement with UDOT's construction of the statute (but only an implicit endorsement of the constitutionality of the taking).

¶4    We reverse and remand. Although we agree with UDOT's statutory position and thus affirm that aspect of the district court's decision, we reverse and remand for further proceedings on the constitutional question. That question—whether a taking of excess property under Utah Code section 72-5-113 fails for lack of a "public use" under the federal or state Takings Clause—is a serious one. Because we conclude that this issue was properly preserved and should have been addressed expressly by the district court, we reverse and remand to allow that court to address this question in the first instance.

I

¶5    In 2010, the Utah Department of Transportation announced a project involving the construction of a light rail line and expansion of 11400 South in Draper, Utah. As a first step, UDOT initiated an eminent domain action against Michael Carlson, the owner of parcels of property adjacent to 11400 South.[1]

---

[1] In the original eminent domain action, Jennifer Carlson and Joseph Scovil, tenants of a dwelling on one of the parcels of property, were also named as parties. These individuals were subsequently relocated with UDOT's assistance, however, and are no

¶6   Together, the parcels consist of approximately fifteen acres. Although only 1.2 acres of the property were necessary for the project, UDOT sought to condemn all fifteen acres. UDOT invoked Utah Code section 72-5-113 in support of its statutory authority to "acquire" the full fifteen acres and subsequently to "sell the remainder or . . . exchange it for other property needed for highway purposes." UTAH CODE § 72-5-113. It also asserted an interest in avoiding the inconvenience and cost of litigating severance damages in connection with a partial taking of property.

¶7   Carlson stipulated that 1.2 acres of his property were necessary for a public use, but opposed condemnation of the rest of his land. As to Utah Code section 72-5-113, Carlson insisted that UDOT's right to "acquire" property was limited to voluntary acquisition and did not extend to the power of eminent domain. In addition, Carlson asserted that UDOT's taking of excess property unnecessary to the completion of a public project—and aimed primarily at avoiding litigation over severance damages—was both statutorily and constitutionally improper.

¶8   UDOT filed a motion for partial summary judgment. Although the briefing and argument on the motion focused principally on the question of UDOT's *statutory* authority to condemn excess property, Carlson also raised constitutional concerns. First, he advocated for his interpretation of section 113 on constitutional avoidance grounds. Thus, Carlson urged the rejection of UDOT's statutory position on the ground that it raised serious questions under the Takings Clauses of the Utah and U.S. Constitutions. Second, Carlson asserted an outright challenge to the constitutionality of UDOT's condemnation of excess property. Specifically, he insisted that UDOT had failed to "articulat[e] . . . a public use" for the excess property in question, asserting that a mere interest in

---

longer parties to this action. Salt Lake County was also named as a party, based on its interest in the property by virtue of property taxes owed to the county. The county filed an answer to the complaint, stating that it had no objection to the condemnation of the property, and asked to be dismissed as a party in the case. Although the district court never formally dismissed the county, it had no further involvement in the proceedings below or this appeal.

"avoid[ing] litigat[ion] about a claim for damages" is insufficient, rendering the statute "[]constitutionally infirm" as applied here.

¶9   In response, UDOT asserted that the transportation project in general qualified as a public use, and thus the only remaining question was whether the *amount* of property taken was "necessary" for that public use. On the question of the amount of property taken, UDOT further asserted that section 113 granted it discretionary authority to decide whether the excess property was "necessary" for its project.

¶10  The district court entered partial summary judgment for UDOT. In so doing it expressly endorsed UDOT's construction of Utah Code section 72-5-113, holding that the statutory authorization for UDOT to "acquire" excess property was not "ambiguous in this context, and . . . includes condemnation." In granting UDOT's motion, the district court must have rejected Carlson's constitutional arguments, but it did not address them in the express terms of its order.

¶11  Carlson filed a petition for interlocutory appeal, which we granted. We review the district court's summary judgment decision de novo. *Bahr v. Imus*, 2011 UT 19, ¶ 15, 250 P.3d 56.

II

¶12  The parties' briefs on appeal mirror the content and focus of their summary judgment papers. Thus, the principal focus of the arguments on appeal concerns the statutory question whether Utah Code section 72-5-113 authorizes UDOT's taking of excess property. Yet Carlson also raises constitutional grounds for reversal, asserting both a constitutional avoidance basis for rejecting UDOT's statutory position and an outright constitutional challenge to the statute as applied.

¶13  We agree with and uphold the district court's statutory analysis but remand to allow the court to address Carlson's constitutional challenge in the first instance. First, we interpret section 113 as an express grant of legislative authority for UDOT to exercise the power of condemnation to take excess property for the purpose of avoiding the cost and inconvenience of litigation over severance damages. Second, because we read the statute as prescribing an express grant of such authority, we find no occasion for invoking the canon of constitutional avoidance. And finally, we reverse and remand to allow the district court to address Carl-

son's constitutional challenge to section 113 as applied here, finding that challenge to have been properly presented to the district court but not addressed in its decision.

## A. UDOT's Statutory Authority

¶14 The transportation code enumerates the powers and responsibilities of UDOT. Where "an entire lot, block, tract of land, or interest or improvement in real property is to be acquired by the department and the remainder is to be left in a shape or condition of little value to its owner or to give rise to claims or litigation concerning damages," the code empowers UDOT to "acquire the whole of the property and [to] sell the remainder or [to] exchange it for other property needed for highway purposes." UTAH CODE § 72-5-113.

¶15 The statutory question presented concerns the scope of this provision. UDOT interprets it as an expansive grant of eminent domain power that is dispositive of the statutory question presented. Because it reads "acquire" to encompass the exercise of the power of condemnation, UDOT interprets this provision as an express endorsement of the use of such power in the circumstances of this case—involving the acquisition of excess property for the purpose of avoiding litigation over severance damages. Carlson's construction is much narrower. He interprets "acquire" to be limited to voluntary acquisition, as by purchase. And he urges, alternatively, that UDOT's expansive view would run afoul of the restrictions on the "public use" grounds for condemnation in the eminent domain statute, Utah Code section 78B-6-501. We find Carlson's construction untenable and thus endorse the reading advanced by UDOT and adopted by the district court.

¶16 First, the plain terms of section 113 leave no room for the limitation that Carlson attributes to it. The statute expressly acknowledges UDOT's power to "acquire" excess property, and the ordinary sense of "acquire" is easily broad enough to encompass the exercise of the power of eminent domain. To "acquire" is "to come into possession, control, or power of disposal of often by some uncertain or unspecified means." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 18 (2002); *see also* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 15 (5th ed. 2011) ("[t]o gain possession of"); BLACK'S LAW DICTIONARY 26 (9th ed. 2009) ("to gain possession or control of; to get or obtain"). That ordinary

sense of "acquire" admits of no apparent limitation. UDOT can gain possession or control of property as much by condemning it as it can through a voluntary exchange. And nothing on the face of the statute suggests that UDOT's prerogative of *acquiring* excess property is limited to *voluntary acquisitions*. *See Berrett v. Purser & Edwards*, 876 P.2d 367, 370 (Utah 1994) (noting the "cardinal rule of statutory construction . . . that courts are not to infer substantive terms into the text that are not already there").

¶17 Indeed, Carlson's limiting construction is further undermined by a related provision of the transportation code, Utah Code section 72-5-103. That provision authorizes UDOT to "*acquire* any real property . . . by gift, agreement, exchange, purchase, *condemnation*, or otherwise" if "necessary for . . . state transportation purposes." UTAH CODE § 72-5-103 (emphasis added). This provision, when read in pari materia with section 113, confirms that the transportation code's use of "acquire" is in line with the ordinary sense of the word set forth above. *See Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) ("The rule of in pari materia . . . is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context."); *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 12, 248 P.3d 465 ("Our task . . . is to determine the meaning of the text given the relevant context of the statute. . . .").

¶18 Thus, we see no reasonable way to read section 113's endorsement of UDOT's power to "acquire" excess property as limited to voluntary transactions. The ordinary sense of "acquire" is not so limited, and related provisions of the transportation code confirm that the legislature was using the term in this ordinary, broad sense.

¶19 Second, we see no basis for reading section 113 as limited by the terms of the eminent domain statute, Utah Code section 78B-6-501. Carlson asks us to view this provision as a comprehensive catalog of all "public uses" for which the power of eminent domain is authorized. And because that catalog does not expressly endorse the condemnation of excess property for the purpose of avoiding litigation over severance damages, Carlson urges us to deem it to override the endorsement of such a use of the eminent domain power in section 113 of the transportation code. Carlson's position, in other words, is that the transportation code is subor-

dinate and subject to the eminent domain statute, and that the latter forecloses any endorsement of the taking of excess property set forth in the former.

¶20 We find no room for that construction in the language and structure of the governing statutes. The eminent domain statute specifically enumerates a number of public uses for which the power of condemnation is authorized, including for reservoirs, bicycle paths, roads, dams, canals, railroads, cemeteries, etc. UTAH CODE § 78B-6-501. But these enumerated public uses are not exclusive. They merely establish a general starting point. That is clear from the face of the eminent domain statute, which not only enumerates authorized public uses but also includes an open-ended catchall—authorizing eminent domain for "all other public uses authorized by the Legislature." *Id*. § 78B-6-501(2).

¶21 That conclusion is confirmed, moreover, by the broader context of the legislature's authorization of eminent domain across a wide range of statutory provisions. Thus, the legislature clearly recognizes its prerogative of supplementing the public uses identified in the eminent domain statute, as it has enacted a range of other provisions authorizing condemnation for public uses beyond those enumerated in the public domain statute. As with UDOT, the legislature has authorized other state agencies to exercise broad powers of eminent domain.[2] And throughout the code, it has authorized condemnation for specific public uses that are not included in the eminent domain statute.[3]

---

[2] *See, e.g.*, UTAH CODE § 73-23-3(3) ("[T]he Division of Water Resources . . . may acquire land or any other property right by any lawful means, including eminent domain. . . ."); *id.* § 63C-7-202(8) ("The Utah Communications Agency Network shall have the power to . . . acquire, by gift, grant, purchase, or by exercise of eminent domain, any real property or personal property in connection with the acquisition and construction of a communications network and all related facilities. . . ."); *id.* § 65A-11-1(4) ("The division [of Forestry, Fire, and State Lands] may . . . acquire any additional lands, necessary for the control or the prevention of . . . floods, either by purchase, exchange, lease, condemnation, or gift.").

[3] *See, e.g.,* UTAH CODE § 17C-2-601(1) (authorizing condemnation by community development renewal agency for removal of

¶22 For all these reasons, the eminent domain statute cannot properly be understood as the be-all, end-all of authorized "public uses." It is only a starting point, subject to supplementation by further legislative enactments. We accordingly reject Carlson's attempt to limit the condemnation power set forth in the transportation code by the terms of the eminent domain statute. And we therefore affirm the district court's endorsement of UDOT's statutory authority to condemn excess property for transportation purposes under Utah Code sections 72-5-103 and -113.

## B. Constitutional Avoidance

¶23 The canon of constitutional avoidance is an important tool for identifying and implementing legislative intent. Its premise is a presumption that the legislature "either prefers not to press the limits of the Constitution in its statutes, or it prefers a narrowed (and constitutional) version of its statutes to a statute completely stricken" by the courts. Richard L. Hasen, *Constitutional Avoidance and Anti-Avoidance by the Roberts Court*, 2009 SUP. CT. REV. 181, 186. Thus, when a court rejects one of two plausible constructions of a statute on the ground that it would raise grave doubts as to its constitutionality, it shows proper respect for the legislature, which is assumed to "legislate[] in the light of constitutional limitations." *Rust v. Sullivan*, 500 U.S. 173, 191 (1991); *see also Clark v. Martinez*, 543 U.S. 371, 382 (2005) (justifying the canon as a "means of giving effect to congressional intent, not of subverting it").

¶24 Yet too-hasty invocation of the canon can easily undermine legislative intent.[4] Where possible, we decide cases "on the pre-

---

"blight" and for urban renewal); *id.* § 72-7-510 (authorizing eminent domain for removal of nonconforming outdoor advertising); *id.* § 23-21a-3 ("initiating the condemnation and purchase" of two islands in the Great Salt Lake "for the protection and perpetuation of the American white pelican").

[4] *See* Richard L. Hasen, *Constitutional Avoidance and Anti-Avoidance by the Roberts Court*, 2009 SUP. CT. REV. 181, 189 (noting that some invocations of the canon seem to "signal[] a Court that is actively engaged in shaping law and policy, not acting modestly"); *United States v. Marshall*, 908 F.2d 1312, 1318 (7th Cir. 1990) ("The canon about avoiding constitutional decisions . . . must be used with care, for it is a closer cousin to invalidation than to interpretation."); Judge Henry Friendly, *Mr. Justice Frankfurter and*

ferred grounds of statutory construction," thereby avoiding analysis of underlying constitutional issues "unless required to do so." *State v. Wood*, 648 P.2d 71, 82 (Utah 1982). So if one of two proposed interpretations of a statute can be eliminated as untenable, we must reject it in favor of the one that more clearly advances the intent of the legislature. Thus, for the constitutional avoidance canon to even apply, "the statute must be genuinely susceptible to two constructions"—a determination that is made "*after, and not before*, its complexities are unraveled." *Almendarez-Torres v. United States*, 523 U.S. 224, 238 (1998) (emphasis added).[5]

¶25 This is not a proper case for disposition by the canon of constitutional avoidance. Because the legislature expressly authorized UDOT's condemnation of Carlson's excess property, we are not in a position to repudiate that view of the statute on constitutional avoidance grounds. Mere *doubts* about the constitutionality of the legislature's endorsement of UDOT's condemnation of excess property are not enough to override the legislature's intent. The only viable basis for doing that would be an actual determination of unconstitutionality.

### C. Carlson's Constitutional Claim

¶26 That brings us to Carlson's challenge to the constitutionality of section 113 as applied in this case. Although Carlson raised this question in his briefs on appeal, UDOT essentially sidestepped it. It did so on preservation grounds, asserting that Carlson failed to raise it below. Perhaps that response is understandable, as the briefs on appeal and below were focused principally on matters of statutory construction and constitutional avoidance, and the district court rested its decision on only the statute. But our careful review of the record persuades us that Carlson's constitutional challenge was adequately preserved.

¶27 In the district court, the briefing and argument on the constitutional issue were not extensive. But Carlson did invoke the

---

*the Reading of Statutes*, in BENCHMARKS 211 (1967) (explaining how the canon can "have almost as many dangers as advantages").

[5] *See also Marshall*, 908 F.2d at 1318 ("Canons are doubt-resolvers, useful when the language is ambiguous and 'a construction of the statute is *fairly possible* by which the question may be avoided.'" (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932))).

federal and state Takings Clauses and cited authority for the proposition that "private property cannot be taken by the government . . . except for purposes which are of a public character." *Madisonville Traction Co. v. St. Bernard Mining Co.*, 196 U.S. 239, 251 (1905). At oral argument on the summary judgment motion, moreover, counsel for Carlson emphasized his client's view that "there has not been identified [a] public use of" the excess property condemned by UDOT. Continuing, counsel explained Carlson's constitutional challenge as follows:

> There's [only] been an effort to avoid litigating about a claim for damages. . . . There's been no articulation of a public use that they intend to put to this property. And they just don't. What they've said is we can condemn it because section 72-5-113 gives us the unbridled authority to do so. And I would submit, Your Honor, that interpreted that way, the statute would be unconstitutionally infirm.

¶28 In response, the district judge confirmed his understanding of Carlson's argument, as follows: "[Y]our basic argument is to the extent the statute grants condemnation authority beyond what's reasonably necessary for public use, it's in violation of the state constitution?" Carlson's counsel agreed with that restatement of Carlson's claim.

¶29 We deem Carlson's argument sufficient to have preserved the important question of the constitutionality of section 113 as applied in this case. We could accordingly reach it and resolve the case on the basis of the briefing and argument before us on appeal. Yet we decline to do so. Instead we reverse and remand to allow the district court to address the issue in the first instance.

¶30 That course of action is preferable for a number of reasons. First is the absence of any constitutional analysis in the decision presented for appellate review. A lower court's analysis is often helpful to frame and contextualize the issues for the court on appeal. That would appear to be the case here. Although the district court's decision to stop short of addressing the constitutional question was perhaps understandable (in light of the parties' focus on statutory questions), that decision was ultimately in error, and prudence and comity counsel against our getting ahead of the lower court on an issue of such significance.

¶31 Carlson's constitutional claim raises difficult questions without any clear answers in applicable precedent. The core question is whether UDOT's condemnation of excess property satisfies the "public use" element of the federal and state constitutions. At the federal level, that question has been cued up but not conclusively resolved by the U.S. Supreme Court's decision in *Kelo v. City of New London*, 545 U.S. 469 (2005). *Kelo* reaffirmed the independent vitality of the "public use" element of the federal Takings Clause and marked its outer boundaries. *See id*. at 477–78 (explaining that an underlying public purpose is a necessary element of the analysis, holding that a municipality's economic development purpose was sufficient, but noting that a municipality would be "forbidden from taking . . . land for the purpose of conferring a private benefit on a particular private party"). But while *Kelo* declared that purely private takings as well as takings with only a "mere pretext of a public purpose" were unconstitutional, *id*. at 478, it ultimately "eschewed rigid formulas" for assessing public use and instead "afford[ed] legislatures broad latitude in determining what public needs justify the use of the takings power," *id*. at 483. Our assessment of the case under this federal standard could certainly benefit from further consideration on remand.

¶32 The state-law variant on the "public use" question is even more wide open. In cases involving state takings provisions apparently comparable to Utah's, the courts have adopted a wide range of standards of "public use." In some states, the courts have rejected the *Kelo* standard on the ground that the purpose or original meaning of their state Takings Clauses is incompatible with the notion that "an economic benefit to the government and community, standing alone, does not satisfy the public-use requirement."[6] Other state courts have embraced a standard similar

---

[6] *City of Norwood v. Horney*, 853 N.E.2d 1115, 1123 (Ohio 2006) (holding that "although economic factors may be considered in determining whether private property may be appropriated, the fact that the appropriation would provide an economic benefit to the government and community, standing alone, does not satisfy the public-use requirement of . . . the Ohio Constitution," but stopping short of articulating a test for identifying a public use in contexts that are not purely economic); *see also Cnty. of Wayne v. Hathcock*, 684 N.W.2d 765, 783 (Mich. 2004) (holding that con-

to *Kelo*'s as consistent with their state constitutional provisions,[7] while still others have adopted a variation on *Kelo*.[8]

¶33 We are reluctant to venture a view on this difficult question without the benefit of a district court decision after further factual development of the record. A remand is appropriate for that reason alone.

¶34 There is also a second basis for a remand, and that is the lack of any clearly articulated "public use" proffered by UDOT on the record before us. Because the case has proceeded largely on

---

demning property to transfer it to a private entity is only acceptable for one of three traditional "public uses," where the economic benefit is not merely incidental: (1) "where public necessity of the extreme sort requires collective action," such as building infrastructure like railroads; (2) "where the property remains subject to public oversight after transfer to a private entity"; and (3) where the property is selected for condemnation because of "facts of independent public significance," rather than the interests of the eventual private owner, such as where condemnation and razing of a blighted area is itself a public use, not the subsequent rebuilding by a private entity (internal quotation marks omitted)).

[7] *Mayor & City Council of Baltimore City v. Valsamaki*, 916 A.2d 324, 353 (Md. 2007) (stating that "economic development [is] a public purpose and constitutionally provides the City with authorization to utilize its power of eminent domain in achieving such development," but finding the facts of the particular case distinguishable and thus not qualifying as a public use).

[8] *R.I. Econ. Dev. Corp. v. The Parking Co.*, 892 A.2d 87, 104 (R.I. 2006) (broadly defining public purpose as "public in nature [and] . . . designed to protect the public health, safety, and welfare," but holding that this does not go so far as to encompass the condemning authority's "desire for increased revenue" (citation and internal quotation marks omitted)); *Hathcock*, 684 N.W.2d at 786 (holding that the framers of the Michigan constitution did not intend "public use" to include "incidental benefits to the economy," reasoning that "[e]very business . . . contribute[s] in some way to the commonwealth"); *Sw. Ill. Dev. Auth. v. Nat'l City Envtl. L.L.C.*, 768 N.E.2d 1, 9 (Ill. 2002) (stating that although "economic development is an important public purpose," it cannot go so far as to take one business's property to allow another to expand).

statutory grounds, UDOT appears not to have clearly articulated its anticipated plans or purposes for the excess property at issue. Such an articulation could be crucial to an evaluation of the viability of UDOT's taking under the public-use standard ultimately adopted by the court. *See Fallbrook Irrigation Dist. v. Bradley*, 164 U.S. 112, 159–60 (1896) ("[W]hat is a public use frequently and largely depends upon the facts and circumstances surrounding the particular subject-matter in regard to which the character of the use is questioned."); *Mayor & City Council of Baltimore City v. Valsamaki*, 916 A.2d 324, 351 (Md. 2007) (holding that eminent domain was inappropriate even under a broad reading of "public use" because "the evidence presented below of public use was sparse"); *Sw. Ill. Dev. Auth. v. Nat'l City Envtl. LLC*, 768 N.E.2d 1, 8 (Ill. 2002) ("[E]ach case must turn on its own facts." (internal quotation marks omitted)). Thus, we deem it prudent and appropriate to remand to allow for appropriate consideration of the constitutional question presented in the district court.

¶35  Finally, under these circumstances a remand is not likely to interfere with the goal of judicial economy. We could decide the legal question now, but we would first need to call for supplemental briefing, as the question of the proper scope and application of the doctrine of public use was not developed in detail in the briefs on appeal. And after supplemental briefing and issuance of an opinion articulating the applicable legal standard, we still would likely have to remand the case to allow the district court to apply the standard to the facts in the first instance. At that point, moreover, another appeal would seem likely. With all that in mind, the prudent, economical course seems to us to be a remand of the entire matter now, to allow the district court to make the legal, factual, and mixed determinations necessary to resolve the public-use question together. That approach, in other words, seems not only prudent in terms of teeing up the issue completely for us, but ultimately more efficient to the final resolution of this important question.

¶36 We accordingly reverse and remand to allow the district court to determine the constitutionality of UDOT's condemnation of Carlson's excess property under section 113. We leave to the district court's discretion the question whether and to what extent to allow the parties to further develop the factual record and to submit supplemental briefing on remand.