*This opinion is subject to revision before final publication in the Pacific Reporter*

**2017 UT 74**

IN THE

SUPREME COURT OF THE STATE OF UTAH

OUTFRONT MEDIA, LLC,
*Appellant,*

*v.*

SALT LAKE CITY CORPORATION, CORNER PROPERTY, L.C.,
and UTAH OUTDOOR ADVERTISING, INC.,
*Appellees.*

No. 20160150
Filed October 23, 2017

On Direct Appeal

Third District, Salt Lake
The Honorable Todd M. Shaughnessy
No. 160900413

Attorneys:

Leslie Van Frank, Bradley M. Strassberg, Salt Lake City, for appellant

Samantha J. Slark, Katherine N. Lewis, Salt Lake City, for appellee
Salt Lake City Corporation

Jon H. Rogers, Salt Lake City, for appellees Corner Property, L.C.
and Utah Outdoor Advertising, Inc.

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE LEE, JUSTICE DURHAM, JUSTICE HIMONAS, and
JUSTICE PEARCE joined.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶ 1   In this case, we review Salt Lake City's decisions regarding two billboard owners' requests to relocate their billboards. Outfront Media, LLC, formerly CBS Outdoor, LLC, (CBS) came out the worse

in the City's decision-making process. The City denied CBS's request to relocate its billboard to an adjacent lot along Interstate 15 (I-15). The same day, the City granted Corner Property, L.C.'s request to relocate its billboard to the lot CBS was vacating.

¶ 2  Dissatisfied with the City's decisions, CBS appealed to a land use hearing officer, who upheld both decisions. CBS then sought judicial review in district court under the Municipal Land Use, Development, and Management Act, Utah Code section 10-9a-801. The district court also upheld the City's decisions. CBS now appeals to this court, contending that the City's denial of its relocation request and grant of Corner Property's were arbitrary, capricious, and illegal.

¶ 3  CBS's primary argument on appeal is that the City's decision to deny CBS's requested relocation was "illegal" because the City invoked the power of eminent domain to effect a physical taking of CBS's billboard without complying with the procedural requirements that constrain the use of eminent domain. In particular, CBS asserts that the City was required to comply with Utah Code section 78B-6-504(2)(b), which provides that "[p]roperty may not be taken by a political subdivision of the state unless the governing body of the political subdivision approves the taking." For a city, the "governing body" is the city's "legislative body." For Salt Lake City, that legislative body is the city council. It is undisputed that the City's mayor made the decision denying CBS's request to relocate its billboard without the approval of the Salt Lake City Council.

¶ 4  At the heart of this case is the proper interpretation of Utah Code section 10-9a-513 (Billboard Compensation Statute), which provides that a municipality is "considered to have initiated the acquisition of a billboard structure by eminent domain" when it denies billboard relocation requests that, like CBS's, meet certain spacing requirements. In CBS's view, under this statute the denial of its relocation request constituted a physical taking of its billboard, which required compliance with the eminent domain procedures. We disagree. The Billboard Compensation Statute does not provide that a municipality *has taken* a billboard structure when it denies a relocation request. Instead, under that section, a municipality is only *considered* to have done so for purposes of compensation. We therefore view the Billboard Compensation Statute as creating a standalone compensation scheme that does not incorporate, expressly or impliedly, the procedural requirements that circumscribe the eminent domain power. Accordingly, the mayor of Salt Lake City was not required to seek the approval of the Salt Lake City Council before denying CBS's request to relocate its billboard.

¶ 5   We also reject CBS's additional arguments that the Mayor's decision violated the City's billboard ordinance and that the Mayor's decision was arbitrary and capricious. We therefore affirm the district court.

**Background**

¶ 6   CBS owned a billboard at 726 West South Temple, adjacent to I-15. CBS leased the land at that location from Corner Property. Corner Property also owned land and had a billboard at 280 West 500 South. In the fall of 2014, CBS's lease from Corner Property was about to expire, so CBS sought a means for relocating its billboard. CBS submitted a request—not the one currently before us—to the City to relocate its billboard to an adjacent lot at 738 West South Temple, and to increase its billboard's height. The City denied this request, and this denial was affirmed upon district court review.[1] CBS then voluntarily demolished its billboard to avoid trespassing on Corner Property's land.

¶ 7   In its letter denying CBS's first request, the City told CBS it could "modify its application to either bank its billboard credits [for the now demolished sign] . . . or request to relocate the sign under Utah Code 10-9a-511(3)(c)(i)." The City reserved the right, however, to condemn the sign under Utah Code section 10-9a-513(2). CBS accepted this invitation to modify its relocation request ten months later.[2] Its modified relocation request conformed to the requirements

---

[1] CBS made its initial relocation request under Utah Code section 72-7-510.5, which allows the owner of a sign to take certain actions if a UDOT improvement obstructs the view of the sign. Under this statute "the owner of the sign may: (a) adjust the height of the sign; or (b) relocate the sign to a point within 500 feet of its prior location, if" certain other requirements are met. Because CBS's request sought to both "relocate the sign" and "adjust the height of the sign," the City denied the request. CBS sought an administrative appeal, which the City denied. It then sought district court review, and the district court affirmed the City's conclusion that section 72-7-510.5 allows only relocation or height increase, but not both. CBS did not appeal from that decision.

[2] The City and Corner Property note that CBS tore down its billboard before modifying its request to relocate to conform to the requirements of Utah Code section 10-9a-511(3)(c)(i) (the Billboard Relocation Statute). In Corner Property's view, this means that CBS

(Continued)

3

of Utah Code section 10-9a-511(3)(c)(i) (the Billboard Relocation Statute). That statute provides that a municipality may, despite a prohibition in its zoning ordinance, agree to a mutually acceptable relocation of a billboard. But if the City denies a billboard owner's request to relocate, and the request meets certain spacing requirements, the City "is considered to have initiated the acquisition of [the] billboard structure by eminent domain."[3] CBS's requested relocation, from the 726 lot to the 738 lot, was within the spacing requirements.

¶ 8 Shortly after CBS first applied to relocate its billboard, Corner Property also requested to relocate a billboard under the Billboard Relocation Statute. Corner Property asked the City to permit it to relocate its billboard from 280 West 500 South to 726 West South Temple. This move failed to satisfy the spacing requirements in the Billboard Compensation Statute, so the City would have been free to deny it without paying just compensation. The City could not grant both CBS's and Corner Property's requests to relocate, because state law prohibits freeway-oriented billboards from being located within 500 feet of each other,[4] and the two South Temple lots are within that spacing restriction. Both relocations were also technically prohibited under the City's zoning ordinance pertaining to billboards, Salt Lake City Code section 21A.46.160(N). That ordinance prohibits the construction of new billboards in a "gateway" area, which includes I-15 and the area of 500 South where Corner Property's billboard was previously located.[5]

---

did not have a billboard to relocate, but instead was the owner of only billboard credits. But this overlooks the fact that the City invited CBS to "modify" its application to relocate, including the specific option of modifying the request to conform to the Billboard Relocation Statute. The City has thus treated CBS's request to relocate as if it was filed while the billboard was still in existence, and the City has not argued that we should treat it any other way. In any event, because we conclude below that the City validly denied CBS's relocation request, we need not decide whether CBS was technically entitled to file such a request after taking down its billboard.

[3] UTAH CODE § 10-9a-513(2)(a)(iv).

[4] *See id.* § 72-7-505(3).

[5] *See* SALT LAKE CITY CODE § 21A.46.160(B) (defining "gateway").

¶ 9 The City, acting through its then-mayor, Ralph Becker, and without seeking the approval of the city council, denied CBS's request to relocate its billboard and approved Corner Property's. The City stated that its reason for denying CBS's request was that the requested location fell within a gateway under the City's zoning ordinances, and the ordinance prohibits construction of a billboard in a gateway area. The City acknowledged that it had authority under the Billboard Relocation Statute to waive this zoning ordinance, but it informed CBS that it was unwilling to do so because it "has a longstanding policy in favor of retiring and removing billboards as the opportunity to do so arises."

¶ 10 The City granted Corner Property's request to relocate on the same day it denied CBS's. Though, like CBS's request, Corner Property's requested relocation would have been in violation of the "gateway" zoning ordinance, the City waived this ordinance for Corner Property. Mayor Becker submitted a declaration stating that he decided to deny CBS's request, and grant Corner Property's, in order to achieve a net reduction in the number of billboards located in "gateway" areas by one. His decisions resulted in the permanent removal of Corner Property's 500 South billboard.

¶ 11 CBS sought review of these decisions before the City's appeal authority, a land use hearing officer.[6] The hearing officer

---

[6] "[A]ny person adversely affected by the land use authority's decision administering or interpreting a land use ordinance may, within the time period provided by ordinance, appeal that decision to the appeal authority by alleging that there is error in any order, requirement, decision, or determination made by the land use authority in the administration or interpretation of the land use ordinance." UTAH CODE § 10-9a-703(1).

Before the hearing officer, the parties disputed the scope of review by the hearing officer and, in particular, whether the hearing officer could decide issues of state law. The City argued that the hearing officer had authority to determine only the correctness of city decisions insofar as they turned on the interpretation of a city ordinance. The City relied on Utah Code section 10-9a-707 (2016), which provides that "[t]he appeal authority shall determine the correctness of a decision of the land use authority in its interpretation and application of a land use ordinance" and that "[o]nly those decisions in which a land use authority has applied a land use ordinance to a particular application, person, or parcel may

(Continued)

ultimately upheld the City's decisions to deny CBS's request and approve Corner Property's. CBS then sought judicial review in district court.[7] The district court rejected CBS's arguments and concluded that the City's decisions were not arbitrary, capricious, or illegal, and affirmed the decision. CBS now appeals, pressing the same arguments it made below. We have jurisdiction under Utah Code section 78A-3-102(3)(j).

**Standard of Review**

¶ 12 This is an appeal from a district court's review of an administrative appeal challenging a municipal land use decision.[8]

---

be appealed to an appeal authority." The hearing officer disagreed and concluded that he had authority to review the City's decisions in their entirety, including the aspects of state law that were implicated by the City's decisions.

[7] "Any person adversely affected by a final decision made in the exercise of or in violation of the provisions of this chapter may file a petition for review of the decision with the district court within 30 days after the decision is final." UTAH CODE § 10-9a-801(2)(a).

The district court determined that the hearing officer's authority was limited to considering the application and interpretation of city ordinances, not state statutes, and accordingly disregarded the portions of the hearing officer's decision that dealt with state law. No party has argued that we need to resolve the issue of the scope of the hearing officer's authority, and so we express no opinion as to that issue.

[8] The parties dispute whether on appeal we review the decision of the City or the hearing officer; neither argues that we review the decision of the district court. The City argues that, because the hearing officer in this case "perform[ed] the same review as a district court in a petition for judicial review or an appellate court on an appeal from that decision," the decision we review is the one made by the City, that is, by Mayor Becker. CBS counters that, under Utah Code section 10-9a-801, the courts review only a "final decision," which Utah Code section 10-9a-708 defines as the "written decision" of the "appeal authority." We disagree with both parties' characterization of our review. Their apparent consensus that we do not review the decision of the district court may be attributable to language in our previous cases suggesting that, "[w]hen a district court reviews an order of a local land use authority and we exercise appellate review of the district court's judgment, we act as if we were reviewing the land use authority's decision directly." *Fox v.*

(Continued)

6

"When a district court reviews an order of a local land use authority and we exercise appellate review of the district court's judgment, . . . we afford no deference to the district court's decision."[9] The legislature has directed that "[t]he courts shall . . . presume that a decision, ordinance, or regulation made under the authority of this chapter is valid; and [] determine only whether or not the decision, ordinance, or regulation is arbitrary, capricious, or illegal."[10] "A determination of illegality requires a determination that the decision, ordinance, or regulation violates a law, statute, or ordinance in effect at the time the decision was made or the ordinance or regulation adopted."[11] The proper interpretation of a set of statutes presents a question of law, which we review for correctness.[12] We review the interpretation of ordinances for correctness as well.[13] A decision is

---

*Park City*, 2008 UT 85, ¶ 11, 200 P.3d 182. But as we have recently noted, this language should not be understood to mean that the district court's decision is a superfluity. *See McElhaney v. City of Moab*, 2017 UT 65, ¶¶ 15–26, __ P.3d __. Our recent decision in *McElhaney* clarified that the fact that we afford no deference to the intermediate court does not obviate the need for parties to make and preserve below the arguments they wish to press on appeal. *Id.* ¶¶ 24–25. And the lack of deference likewise does not mean that we are not in fact reviewing the decision of the district court. So, as we said in *McElhaney*, when we exercise appellate review of a district court's judgment in connection with judicial review under Utah Code section 10-9a-801, "we review the intermediate court's decision." *Id.* ¶ 26.

[9] *Fox*, 2008 UT 85, ¶ 11.

[10] UTAH CODE § 10-9a-801(3)(a) (2016). We note that this provision was recently amended, effective May 9, 2017. *See* H.B. 232, 62nd Legislature, Gen. Sess. (2017). We apply the version of the statute that was in effect at the time of the events relevant to this proceeding.

[11] UTAH CODE § 10-9a-801(3)(d) (2016). *See Patterson v. Utah Cty. Bd. of Adjustment*, 893 P.2d 602, 604 (Utah Ct. App. 1995) ("[W]hether or not the Board's decision is illegal depends on a proper interpretation and application of the law.").

[12] *2 Ton Plumbing, L.L.C. v. Thorgaard*, 2015 UT 29, ¶ 17, 345 P.3d 675.

arbitrary and capricious only if it is not supported by "substantial evidence," which is "that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion."[14]

**Analysis**

¶ 13 CBS levels three challenges at the City's decision denying its billboard relocation request.[15] First, CBS contends that the decision

---

[13] In the past, we "afford[ed] some level of non-binding deference to" a local agency's interpretation of its own ordinance. *Carrier v. Salt Lake Cty.*, 2004 UT 98, ¶ 28, 104 P.3d 1208. But this deference cannot stand in view of subsequent developments in our precedent. Our cases since *Carrier* have expressly rejected the notion of affording *Chevron*-style deference to state agencies' interpretation of statutes, *see Hughes Gen. Contractors, Inc. v. Utah Labor Comm'n*, 2014 UT 3, ¶ 25, 322 P.3d 712, or regulations, *see Ellis-Hall Consultants v. Pub. Serv. Comm'n*, 2016 UT 34, ¶ 21, 379 P.3d 1270. Given that we do not defer to state agencies on pure questions of law, there is even less reason to defer to local agencies' interpretations of ordinances, given that those local agencies "do not possess the same degree of professional and technical expertise as their state agency counterparts." *Carrier*, 2004 UT 98, ¶ 28. In keeping with our recent decisions, we review the interpretation of ordinances for correctness.

[14] *Bradley v. Payson City Corp.*, 2003 UT 16, ¶ 15, 70 P.3d 47 (citation omitted).

[15] In its briefs, CBS also challenges the City's decision to grant Corner Property's request to relocate. CBS contends that the grant of Corner Property's application was illegal for two reasons. First, CBS argues that Corner Property's relocated billboard would be in violation of city ordinances regarding the permissible height and size of billboards. Second, CBS argues that the City's billboard ordinance forbids the mayor from waiving a zoning ordinance for a billboard owner who, like Corner Property, requests to move a billboard that is outside the spacing requirements set forth in the Billboard Compensation Statute. But counsel for CBS conceded at oral argument that, were we to conclude that the City's decision to deny CBS's request to relocate its billboard was not arbitrary, capricious, or illegal, then CBS lacks standing to challenge the grant of Corner Property's request. *See* Oral Argument at 1:53:16–1:55:45, https://www.utcourts.gov/opinions/streams/sup. Because we reach just that conclusion below, we accordingly do not consider CBS's arguments challenging the grant of Corner Property's request.

to deny its request was illegal because Mayor Becker did not obtain the approval of the city council before making that decision. In CBS's view, such a denial is an exercise of the eminent domain power. We reject this argument and hold that the procedural requirements of eminent domain mandated by Utah Code section 78B-6-504 do not apply because, under the Billboard Compensation Statute, relocation denials are merely "considered" to be the acquisition of a billboard structure by eminent domain for compensation purposes, but these denials do not actually involve the formal exercise of the eminent domain power and the concomitant procedures the legislature has prescribed to restrain the exercise of that power.

¶ 14 Second, CBS contends that Salt Lake City's billboard ordinance prohibited the City from denying CBS's request to relocate. That ordinance provides that "[e]xcept as otherwise authorized herein, existing billboards may not by relocated except as mandated by the requirements of Utah State law."[16] In CBS's view, this means that if a relocation denial would trigger just compensation under the Billboard Compensation Statute, then the relocation is "mandated by . . . State law," and the City *must* approve the relocation request. We find no support for this interpretation of the ordinance in its plain language, and in any event, even if that were the proper interpretation, it would be preempted by state law.

¶ 15 Finally, CBS argues that Mayor Becker's decision to deny CBS's request and approve Corner Property's was arbitrary and capricious because, in CBS's view, a city's mayor cannot act according to an unwritten policy to reduce the number of billboards in the city. We disagree. There is substantial evidence in the record that Mayor Becker's administration had a goal of reducing the number of billboards in the city, and his decision to deny CBS's request and approve Corner Property's resulted in the net reduction of one billboard from a gateway area in the City, directly furthering that goal.

## I. The City's Decision to Deny CBS's Billboard Relocation Request Was Not Illegal, Because the Eminent Domain Statutes Do Not Apply to Such Denials

¶ 16 CBS argues that the City's decision to deny its request to relocate its billboard was illegal because the decision was made by the City's mayor without the approval of the City's legislative body,

---

[16] SALT LAKE CITY CODE § 21A.46.160(CC).

the city council. In CBS's view, the provisions of Utah Code sections 78B-6-501 through 522 (the Eminent Domain Statutes), especially section 78B-6-504's requirement of legislative approval of a taking, apply to the decision to deny a relocation request that triggers the requirement of just compensation under the Billboard Compensation Statute.

¶ 17 We disagree. The Billboard Compensation Statute neither expressly nor impliedly incorporates the Eminent Domain Statutes, so the procedures specified there do not apply to the denial of relocation requests submitted under the Billboard Relocation Statute. Instead, the Billboard Compensation Statute functions as a stand-alone scheme, mandating the payment of compensation upon the occurrence of certain triggering events.

¶ 18 We begin with the text of the statutes. The Billboard Relocation Statute provides:

> Notwithstanding a prohibition in its zoning ordinance, a municipality may permit a billboard owner to relocate the billboard within the municipality's boundaries to a location that is mutually acceptable to the municipality and the billboard owner . . . . If the municipality and billboard owner cannot agree to a mutually acceptable location within 90 days after the owner submits a written request to relocate the billboard, the provisions of Subsection 10-9a-513(2)(a)(iv) apply.[17]

The Billboard Compensation Statute provides, in pertinent part:

> A municipality is considered to have initiated the acquisition of a billboard structure by eminent domain if the municipality prevents a billboard owner from . . . relocating a billboard into any commercial, industrial, or manufacturing zone within the municipality's boundaries, if [certain spacing requirements are met]; and . . . the billboard owner has submitted a written request under Subsection 10-9a-511(3)(c); and . . . the municipality and billboard owner are unable to agree,

---

[17] UTAH CODE § 10-9a-511(3)(c).

within the time provided in Subsection 10-9a-511(3)(c), to a mutually acceptable location[.][18]

¶ 19 In sum, the Billboard Relocation Statute permits a municipality to agree to a billboard relocation request that would otherwise be prohibited by the city's zoning ordinance. But if the city does not agree to a relocation request, and that request meets certain spacing requirements, the city is "considered" under the Billboard Compensation Statute to have "initiated the acquisition of the billboard structure by eminent domain."

¶ 20 The Eminent Domain Statutes, on the other hand, offer a host of procedural protections for property owners. Particularly relevant here, Utah Code section 78B-6-504(2)(b) provides that "[p]roperty may not be taken by a political subdivision of the state unless the governing body of the political subdivision approves the taking." The parties agree that the "governing body" here is the Salt Lake City Council and that the city council did not participate in the decision to deny CBS's relocation request.

¶ 21 CBS argues that the Eminent Domain Statutes apply because, in its view, the denial of its request to relocate a billboard constitutes a physical taking of the billboard. It points to the common textual link between the Billboard Compensation Statute and the Eminent Domain Statutes: both use the phrase "eminent domain." The Billboard Compensation Statute provides that the City "is considered to have initiated the acquisition of a billboard structure by eminent domain" in certain circumstances, and the Eminent Domain Statutes set procedures to constrain the exercise of the eminent domain power. According to CBS, because the Billboard Compensation Statute tells the City the circumstances in which its denial of a relocation request will constitute an "acquisition by eminent domain," the City is formally exercising its power of

---

[18] *Id.* § 10-9a-513(2)(a)(iv). The Billboard Compensation Statute also mandates compensation in other circumstances, for example where a municipality "prevents a billboard owner from . . . rebuilding, maintaining, repairing, or restoring a billboard structure that is damaged by casualty, an act of God, or vandalism" or from making certain structural modifications or upgrades. *Id.* §§ 10-9a-513(2)(a)(i), (ii), (iii). Because this case features the denial of a request to relocate, we accordingly focus our discussion on that aspect of the Billboard Compensation Statute.

eminent domain and acquiring the billboard whenever it denies such a relocation request. And formal use of that power, CBS argues, necessitates compliance with the Eminent Domain Statutes.

¶ 22 CBS draws support for its position from *Utah Department of Transportation v. Carlson,*[19] claiming that case stands for the principle that, although the permissible public uses for eminent domain are scattered throughout the code, they are all subject to the general requirements of the Eminent Domain Statutes. Additionally, CBS argues that it makes good sense to require the legislative body's approval before the City denies a relocation request, given that condemnation is often expensive, and that the city council is the body typically tasked with budgetary responsibilities.

¶ 23 The City[20] contends that the Eminent Domain Statutes do not apply to billboard relocation denials. Like CBS, the City begins with the text of the Billboard Compensation Statute. The City points out that neither the Billboard Relocation Statute nor the Billboard Compensation Statute incorporates the Eminent Domain Statutes by explicit textual reference. The City argues that the absence of a specific incorporation was a purposeful omission, indicating the legislature's intent that the Eminent Domain Statutes do not apply. The City also rebuts CBS's concern about fiscal responsibility, arguing that the city council, though tasked with general budget creation, does not oversee every action with financial consequences.[21] We agree with the City on each point.

---

[19] 2014 UT 24, 332 P.3d 900.

[20] Corner Property's arguments largely track the City's, so reference to the City's arguments includes both the City and Corner Property unless otherwise noted.

[21] The City also argues that legislative history confirms that the Billboard Compensation Statute does not incorporate the Eminent Domain Statutes, citing a failed bill that would have required compliance with the Eminent Domain Statutes in the context of the Billboard Compensation Statute. Additionally, the City argues that the absurd consequences canon supports its interpretation, describing several absurd consequences that would follow from adopting CBS's interpretation. Because we conclude that the statute unambiguously compels the City's interpretation, we have no need to employ these auxiliary tools of statutory construction here. *See Bagley v. Bagley,* 2016 UT 48, ¶ 10, 387 P.3d 1000 ("When we can ascertain the intent of the legislature from the statutory terms alone,

(Continued)

¶ 24 Under the plain text of the Billboard Compensation Statute, a municipality "is considered to have initiated the acquisition of a billboard structure by eminent domain" when it takes certain actions.[22] The statute does not say that a municipality *must* acquire a billboard structure by eminent domain in those circumstances.[23] Instead, we read the plain language to simply specify that, for compensation purposes, a municipality will be *considered* to have acquired it. "Consider" in this context means "[t]o regard in a certain light or aspect; to look upon (as), think (to be), take for."[24] In other words, "consider" in this context means "will be treated for present purposes as though it has, whether in fact it has or not."[25] We accordingly read the Billboard Compensation Statute to treat a denial under the Billboard Relocation Statute as an acquisition for compensation purposes only, even though the denial itself is not an acquisition.

---

'no other interpretive tools are needed,' and our task of statutory construction is typically at an end." (citation omitted)).

[22] UTAH CODE § 10-9a-513(2)(a).

[23] CBS's argument is driven in part by its flawed assumption that the City has "require[d] termination" of CBS's billboard. In fact, it has done no such thing. It is true that Utah Code section 10-9a-512 states that a "municipality may only require termination of a billboard and associated property rights through . . . eminent domain" or by voluntary transfer. Were the City indeed requiring termination of CBS's billboard, a different analysis may very well apply. But here, it is the termination of its lease from Corner Property, and not an action of the City, that is requiring CBS to terminate its billboard. The fact that the legislature has mandated that the City pay compensation for some relocation denials does not transform the City's action into one "requir[ing] termination" of the billboard.

[24] *Consider*, OXFORD ENGLISH DICTIONARY ONLINE (June 2017), http://www.oed.com/view/Entry/39593?redirectedFrom=consider (last visited September 29, 2017).

[25] The legislature frequently uses the word "considered" in this sense—to treat something in a certain way. *See, e.g.*, UTAH CODE § 75-2-104(1)(a) ("An individual born before a decedent's death who fails to survive the decedent by 120 hours *is considered* to have predeceased the decedent." (emphasis added)).

¶ 25 This reading of the Billboard Compensation Statute is confirmed by subsection 2(d) of that statute. That subsection provides that "[i]f a municipality is considered to have initiated the acquisition of a billboard structure by eminent domain under Subsection 2(a) . . . the municipality shall pay just compensation to the billboard owner in an amount" specified in that subsection.[26] So the Billboard Compensation Statute creates a stand-alone scheme that functions without interface with the Eminent Domain Statutes: subsection 2(a) describes certain triggering conditions and subsection 2(d) describes what compensation must be paid when those conditions occur.

¶ 26 Our reading of the statute is confirmed by two well-worn canons of statutory construction: the canon of independent meaning and the canon of meaningful variation. And our reading is not contradicted by CBS's argument about the delegation of fiscal responsibility in city government. We discuss each point in turn.

### A. *The Canon of Independent Meaning Confirms that the Eminent Domain Statutes Do Not Apply*

¶ 27 CBS's argument overlooks the legislature's use of the word "considered," essentially writing it out of the statute. In CBS's view, by denying a relocation request that meets the spacing requirements, the City *acquires* the billboard by eminent domain. In essence, CBS's interpretation would rewrite the statute as follows: "a municipality ~~is considered to have initiated the acquisition of~~ has acquired a billboard structure by eminent domain" when it denies a relocation request that meets the spacing requirements. But to make this change violates a core principle of statutory interpretation—our distaste for superfluity. That is, we avoid reading statutes in a way that renders portions inoperative. Instead, we seek to read them in a way that gives effect to each word and phrase.[27]

¶ 28 CBS's reading fails to give any independent meaning to the word "considered." On this basis alone, there seems to be good reason to reject CBS's reading of the statute. But CBS's reading also

---

[26] UTAH CODE § 10-9a-513(2)(d).

[27] *See, e.g.*, *Turner v. Staker & Parson Cos.*, 2012 UT 30, ¶ 12, 284 P.3d 600 ("Wherever possible, we give effect to every word of a statute, avoiding '[a]ny interpretation which renders parts or words in a statute inoperative or superfluous.'" (alteration in original) (citation omitted)).

runs afoul of another canon: the canon that different words used in similar statutes are presumed to have different meanings.

### B.  The Canon of Meaningful Variation Confirms that the Eminent Domain Statutes Do Not Apply

¶ 29 Our conclusion is supported by the fact that the Billboard Compensation Statute lacks an express or implied textual cross-reference to the Eminent Domain Statutes. CBS seeks to show that the Eminent Domain Statutes apply by placing the Billboard Compensation Statute alongside a group of statutes that bestow the eminent domain power on municipalities. But this analogy is inapposite—comparing the Billboard Compensation Statute to these statutes reveals it to be an apple among oranges. The statutes to which CBS attempts to analogize all feature a common trait that the Billboard Compensation Statute lacks: each one grants the power of eminent domain to a municipality or agency. These statutes provide that an entity "may acquire land . . . by eminent domain"[28] or "may exercise eminent domain."[29] Typically, though not universally, these statutes include a specific textual cross-reference incorporating the provisions of the Eminent Domain Statutes.[30]

¶ 30 Standing in stark contrast is the Billboard Compensation Statute, which provides that a municipality "is *considered* to have initiated the acquisition . . . by eminent domain" in certain circumstances.[31] No other statutory provision uses the word "considered" in the context of eminent domain. We thus view the

---

[28] *See, e.g.*, UTAH CODE § 69-3-2.

[29] *See, e.g.*, *id.* § 73-26-404; *id.* § 73-23-3(3).

[30] *See, e.g.*, *id.* § 17B-2a-820 ("The state, a county, or a municipality may, by eminent domain under Title 78B, Chapter 6, Part 5, Eminent Domain, acquire within its boundaries a private property interest, including fee simple, easement, air right, right-of-way, or other interest, necessary for the establishment or operation of a public transit district."); *id.* § 73-26-404 ("In order to construct the reservoirs and other facilities authorized under this chapter, the division may exercise eminent domain as provided in Title 78B, Chapter 6, Part 5, Eminent Domain."). *But see, e.g.*, *id.* § 73-23-3(3) ("Division of Water Resources . . . may acquire land or any other property right by any lawful means, including eminent domain . . . .").

[31] *Id.* § 10-9a-513(2)(a) (emphasis added).

Billboard Compensation Statute as something of a unique animal, and we do not find it analogous to statutes granting the power of eminent domain. While the Billboard Compensation Statute uses the term "eminent domain," it neither explicitly cross-references the Eminent Domain Statutes, nor implies such a reference through the use of language similar to statutes that grant the power of eminent domain. Instead, under the terms of the statute, the City is not "acquiring" land or "exercising" eminent domain, but it is merely "*considered* to have initiated the acquisition of a billboard structure by eminent domain." That difference is significant.

¶ 31 The canon of meaningful variation suggests that "[d]ifferent words used in . . . a similar[] statute . . . are assigned different meanings whenever possible."[32] We accord the Billboard Compensation Statute's different words "considered to have initiated" different meanings by construing this section to operate as a standalone scheme, rather than incorporating the Eminent Domain Statutes.

¶ 32 For this reason, CBS's reliance on *Utah Department of Transportation v. Carlson* is misplaced. In that case, we described a number of statutes that grant the power of eminent domain. CBS correctly points out that we recognized in *Carlson* that the legislature has "authoriz[ed]" the use of "eminent domain across a wide range of statutory provisions."[33] And there is a solid basis for CBS's position that, though these grants of the eminent domain power are scattered throughout the code, each is constrained by the Eminent Domain Statutes. But none of those statutes provides that a municipality "*is considered* to have initiated the acquisition of a billboard structure by eminent domain"[34] if it denies a relocation request under certain conditions. So, again, the use of the word "considered" makes a great deal of difference, and distinguishes the Billboard Compensation Statute from statutes that actually grant the power of eminent domain. We now turn to CBS's argument regarding the fiscal impact of denying a billboard relocation request.

---

[32] SUTHERLAND STATUTES & STATUTORY CONSTRUCTION 2A Sutherland Statutory Construction § 46:6 (7th ed. 2016); *see also City Ctr. Exec. Plaza, LLC v. Jantzen*, 344 P.3d 339, 344 (Ariz. Ct. App. 2015).

[33] 2014 UT 24, ¶ 21.

[34] UTAH CODE § 10-9a-513(2)(a) (emphasis added).

*C. The Fiscal Impact of a Relocation Denial Does Not Make It an Exercise of the Eminent Domain Power*

¶ 33 Finally, we address CBS's argument regarding the fiscal impact of a relocation denial. CBS argues that it would be anomalous to interpret the Billboard Compensation Statute to permit the City's mayor to unilaterally exercise the power of eminent domain. CBS argues that it is the City Council that is charged with "drafting ordinances,"[35] "controlling finances and property,"[36] and "purchasing property."[37]

¶ 34 The City points out that the division of labor in a mayor-council form of city government assigns to the mayor a host of functions, and though the city council sets the general budget and appropriations, many of the mayor's actions expend fiscal resources without specific council approval. Though CBS is right that condemnation can be an expensive decision, that fact alone does not override the legislature's decision to merely "consider" relocation denials to be an acquisition by eminent domain. Where the language employed by the legislature contains no intent to incorporate the Eminent Domain Statutes, it is not our role to expand the otherwise limited text of the Billboard Compensation Statute and infer such an incorporation out of concern that good policy requires it.[38]

¶ 35 In sum, the Eminent Domain Statutes do not apply to actions that may trigger the Billboard Compensation Statute. We interpret the Billboard Compensation Statute to mean that, by denying billboard relocation requests that meet the spacing requirements, the City is *considered* to have initiated the acquisition

---

[35] Citing UTAH CODE § 10-3b-203.

[36] Citing *id.* §§ 10-6-101, 10-8-1.

[37] Citing *id.* §§ 10-3b-203(1), 10-8-1.

[38] *See, e.g., Univ. of Utah v. Shurtleff*, 2006 UT 51, ¶ 53, 144 P.3d 1109 ("No matter how persuasive we may find such arguments, we are constrained by our judicial role. Our role is one of interpreting, not drafting."); *see also Hughes Gen. Contractors, Inc. v. Utah Labor Comm'n*, 2014 UT 3, ¶ 29, 322 P.3d 712 ("[T]he interpretive function for us is not to divine and implement the statutory purpose, broadly defined. It is to construe its language. Where, as here, that language dictates an answer to the question presented, we are not at liberty to adopt a different one . . . .").

of a billboard structure by eminent domain, solely for purposes of just compensation as dictated in that section. Because "considered" in this context means "to look upon (as)," we conclude that relocation denials that meet the spacing requirements are only to be looked upon as acquisitions by eminent domain, though in fact they are not.

## II. The City's Decision to Deny CBS's Request Did Not Violate the City's Billboard Ordinance

¶ 36 CBS next challenges the denial of its relocation request as violating Salt Lake City's Billboard Ordinance. That ordinance provides, in relevant part:

> State Mandated Relocation of Billboards: Except as otherwise authorized herein, existing billboards may not be relocated except as mandated by the requirements of Utah state law.[39]

¶ 37 In CBS's view, a relocation is "mandated" by state law—and therefore the City *must* approve a relocation request—when a denial would trigger a right to just compensation under the Billboard Compensation Statute. We reject CBS's reading. It misreads the plain language of the ordinance. Nothing in the ordinance *mandates* that certain relocation requests be granted. The ordinance, on its face, speaks only to the conditions under which relocation will *not* be allowed. And in any event, the Billboard Compensation Statute does not *mandate* relocation of any billboard; it simply specifies circumstances where just compensation must be paid if relocation is denied. The statute gives the municipality the option of permitting the relocation, or denying it and paying just compensation. It nowhere mandates that relocation be permitted to occur. So CBS's reading of the ordinance is misguided. But even if the ordinance had the meaning that CBS assigns it, it would be preempted by state law.

¶ 38 If CBS's interpretation were correct—that the ordinance means that the City must grant relocation requests where denying them would require just compensation—then the ordinance would be preempted by the Billboard Relocation Statute. The City correctly points out that "[i]t is well established that, where a city ordinance is in conflict with a state statute, the ordinance is invalid at its inception. 'In determining whether an ordinance is in "conflict" with

---

[39] SALT LAKE CITY CODE § 21A.46.160(CC).

general laws, the test is whether the ordinance permits or licenses that which the statute forbids and prohibits, and vice versa.'"[40]

¶ 39 Here, the Billboard Relocation Statute gives the City discretion to grant or deny requests for billboard relocation.[41] No ordinance can effectively prohibit the City from exercising that discretion. CBS reads the ordinance to *forbid* the City from denying some relocation requests—those that fall within the spacing requirements that trigger the just compensation requirement under the Billboard Compensation Statute. But the Billboard Relocation Statute expressly *permits* the City to deny such requests, so long as it pays just compensation. This argument therefore fails.

### III. The City's Decision to Deny CBS's Request and Grant Corner Property's Was Not Arbitrary and Capricious, Because It Furthered the City's Goal of Reducing the Number of Billboards in "Gateway" Areas

¶ 40 CBS argues that the City's stated purpose for denying its application—that it was doing so in accordance with its longstanding policy in favor of retiring and removing billboards—was arbitrary and capricious. A decision is arbitrary and capricious when it is not supported by "substantial evidence."[42] Substantial evidence is that "quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion."[43] CBS argues that the City's decisions were arbitrary and capricious because 1) no policy of billboard reduction exists in written form; 2) even if there were a policy, the executive branch cannot make "policy," only the legislative body can; and 3) even if unwritten policies of the executive are acceptable, the executive cannot have a policy that conflicts with an ordinance. We reject the first two arguments, and, even if we agreed with the premise of the third—

---

[40] *Hansen v. Eyre*, 2005 UT 29, ¶ 15, 116 P.3d 290 (citations omitted).

[41] "Notwithstanding a prohibition in its zoning ordinance, a municipality *may* permit a billboard owner to relocate the billboard within the municipality's boundaries to a location that is mutually acceptable to the municipality and the billboard owner." UTAH CODE § 10-9a-511 (3)(c)(i) (emphasis added).

[42] UTAH CODE § 10-9a-801(3)(c).

[43] *Bradley v. Payson City Corp.*, 2003 UT 16, ¶ 15, 70 P.3d 47 (citation omitted).

that an executive's policy cannot conflict with an ordinance—we see no such conflict here.

¶ 41 First, we agree with the City that there is substantial evidence that Mayor Becker had a policy of reducing billboards. The City points to, and CBS does not refute, several pieces of evidence to this effect. For example, Mayor Becker submitted a declaration referring to his "longstanding policy to reduce the total number of billboards within the City." Mayor Becker publicly announced this policy several times, including in his 2013 State of the City address. The City also entered into numerous agreements under Mayor Becker's direction to limit the ability of property owners to place billboards on their property. We agree with the City that this constitutes substantial evidence that the Becker administration had a policy of reducing the number of billboards in the City.

¶ 42 The next question is whether such a policy needs to be in writing to be valid. We conclude that it does not. We see no reason why a city executive is not entitled to have informal policies, i.e., objectives, goals, or standards that he or she applies in carrying out the executive function. Informal executive policies represent an effort to administer consistently, and we agree with the City that an executive branch of city government can make decisions in accordance with informal goals and objectives.

¶ 43 In the end, we are left with CBS's argument that the Becker administration's policy of reducing billboards is inconsistent with the City's Billboard Ordinance. The Billboard Ordinance provides:

> This section is intended to limit the maximum number of billboards in Salt Lake City to no greater than the current number. This chapter further provides reasonable processes and methods for the replacement or relocation of existing nonconforming billboards to areas of the city where they will have less negative impact on the goals and policies of the city which promote the enhancement of the city's gateways, views, vistas and related urban design elements of the city's master plans.[44]

¶ 44 The question here is whether a policy of *actively reducing* the number of billboards is in conflict with a policy to "limit" the number of billboards to "no greater than the current number." We conclude that there is no conflict in these policies. If the mayor had a

---

[44] SALT LAKE CITY CODE § 21A.46.160(A).

policy of *increasing* the number of billboards in the city, then this policy would conflict with the ordinance. But a policy of reducing the total number of billboards is consistent with the goal of "limit[ing]" the number of billboards to no greater than the current number.

¶ 45 Mayor Becker's decision in this case had exactly that effect. By denying CBS's relocation request and granting Corner Property's, he achieved the net reduction of one billboard, and it was a billboard located in a "gateway" area—an area that the City has prioritized as important for protecting the aesthetics of the City. Accordingly, the mayor's decision to deny CBS's relocation request and grant Corner Property's was not arbitrary and capricious.

### Conclusion

¶ 46 We affirm the conclusion that the City's decision to deny CBS's request to relocate its billboard was not arbitrary, capricious, or illegal. The Eminent Domain Statutes do not apply in the context of the Billboard Compensation Statute, so the City was not required to seek city council approval before denying CBS's request. The City's Billboard Ordinance does not forbid the City from denying a billboard relocation request that fits within the spacing requirements of the Billboard Compensation Statute. And Mayor Becker's decision was not arbitrary and capricious because it furthered his established goal of achieving a net reduction in the number of billboards in gateway areas.

――――――――――