2025 UT App 55

# THE UTAH COURT OF APPEALS

RAPS INVESTMENTS LLC,
Appellant,
*v.*
NORTH LOGAN CITY,
Appellee.

Opinion
No. 20230292-CA
Filed April 24, 2025

First District Court, Logan Department
The Honorable Angela Fonnesbeck
No. 220100110

Troy L. Booher, Caroline A. Olsen, and Kevin E.
Anderson, Attorneys for Appellant

Seth J. Tait, Attorney for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN M. HARRIS and RYAN D. TENNEY concurred.

MORTENSEN, Judge:

¶1 Bob Strebel purchased a lot that was the product of an improper subdivision of a larger piece of property.[1] He then sought permission from the local city to build a home on the lot. The city denied his application, asserting that access to the parcel

---

1. "In this opinion, in keeping with our understanding of the parties' preferences and usage," *In re B.D.*, 2024 UT App 104, ¶ 2 n.2, 556 P.3d 86, we refer to the owner of the parcel in question as Strebel even though RAPS Investments LLC is the named party in this appeal. We take no position on the corporate relationship between Strebel and RAPS Investments LLC in adopting the parties' naming convention, which we follow for the sake of continuity, simplicity, and narrative.

was inadequate. That decision was ultimately confirmed by the district court. On appeal, Strebel argues that the city misinterpreted and misapplied its own ordinances and that the district court erred in upholding the city's decision. We agree with Strebel and reverse the district court's decision.

## BACKGROUND

### *The Lot*

¶2      Strebel owns a parcel of real property (the Lot) in North Logan City, Utah (the City). Prior to Strebel's purchase, the Lot was a part of a larger piece of property, which was subdivided into three smaller parcels without observing the applicable land use requirements or obtaining the approval of the City.

¶3      The Lot is located at the far eastern end of 2500 North; the two other lots created by the subdivision are located directly to the west of the Lot. 2500 North is a pre-existing roadway that runs east to west, providing access to eight other residential homes (not involved in the subdivision) as well as the City's cemetery. The road is divided into two roughly equal sections: Lower 2500 North and Upper 2500 North. Lower 2500 North is approximately 1,900 feet long, running from 1600 East on the western side to an underground canal crossing located at approximately 1850 East. The other eight residences along the road are located on Lower 2500 North. Upper 2500 North runs from the canal crossing to its eastern end, where it terminates at approximately 2050 East. The distance from the canal crossing to the three lots is approximately 1,100 feet. Crucial to this dispute is the width of 2500 North. Lower 2500 North varies in width from 13 feet to 19 feet, with an average width of 15 feet. Upper 2500 North is approximately 20 feet wide for its entire length.

*The Ordinance*

¶4     In November 2021, Strebel, along with the owner of the two adjoining lots, renewed a previously filed application to build residential dwellings on their respective lots.[2]

¶5     As counsel for the City explained during the district court proceeding, in Cache County landowners have sometimes subdivided large parcels of land that have been in their families "not knowing that there's such a thing as a subdivision ordinance" and without complying with the requirements of such ordinance. These noncompliant lots are problematic because they make it difficult for municipalities to provide essential infrastructure, such as "sewer, water, power, roads, curb, gutter, sidewalk, etc." To address this common situation, the City enacted an ordinance entitled "12D-207 Post-Division Approval of Improper Subdivision" (the Ordinance) as an additional provision to the North Logan Municipal Code (the NLMC).[3] The Ordinance provides a way to transform a noncompliant lot into a "legal lot" and allow its owner to obtain a building permit. The Ordinance, which represented a collaborative effort between the City and legal counsel for the owners of the three lots, was enacted in November 2018, just a day before Strebel renewed his application to develop the Lot.

¶6     The Ordinance begins with the following definitions in subsection A:

---

2. The original application was filed in 2017.

3. The Ordinance is enumerated as section 12D-207 of the NLMC. For ease of reading, we will refer to it as "the Ordinance" unless we are citing a specific subsection, in which case we will refer to it as "NLMC § 12D-207(X)" in proper citations and "subsection X" in textual references.

- "Applicable Standard" refers to the "zoning ordinances and standards that were in effect at the time that the Improper Lot was created. If the exact date that the Improper Lot [was created] cannot be determined, then the Applicable Standard shall be the zoning ordinances and standards in effect when the Improper Lot can first be identified on the records of the Cache County Recorder's Office." NLMC § 12D-207(A)(1).

- "Innocent Owner" is an "owner of an Improper Lot provided that the owner was not the party that created the Improper Lot, and is not related either remuneratively or familially . . . to the party that created the Improper Lot. If the owner of an Improper Lot was the party, or is related in any way to the party, that created the Improper Lot then that owner is not an Innocent Owner." *Id.* § 12D-207(A)(2).

- "Improper Lot" is "[a] lot, plot, tract of land, or parcel that was subdivided without complying with [applicable subdivision ordinances]." *Id.* § 12D-207(A)(3).

- "Improper Subdivision" refers to the "subdivision of a lot, plot, tract of land, or parcel that created the Improper Lot." *Id.* § 12D-207(A)(4).

- "Parent Lot" is a "lot, plot, tract of land, or parcel from which the Improper Lot(s) were created." *Id.* § 12D-207(A)(5).

- "Post-Division Review" is the "review of an Improper Lot requested by an Innocent Owner to (a) determine the Applicable Standard; (b) to determine if the Improper Lot complies with the Applicable Standard and therefore should be approved; and (c) upon approval of the Improper Subdivision, establish the conditions, requirements and improvements for the Improper Lot that are required by the Applicable Standard." *Id.* § 12D-207(A)(6).

¶7    In subsection B, the Ordinance provides the prerequisites that an Innocent Owner must meet to use the process outlined in the Ordinance:

> If the Improper Lot has been subdivided from the Parent Lot for a minimum of ten (10) years, and [the Innocent Owner] has attempted to bring the Improper Lot into compliance with the provisions of this chapter but has been unable to do so either because of (i) the lack of participation by other owners that must participate in order to comply with the provisions of this chapter; or (ii) any other hardship on the Innocent Owner, then the Innocent Owner may apply to have the Improper Lot reviewed to avoid undue hardship and inequities on the innocent owner.

*Id.* § 12D-207(B).

¶8    Subsection C addresses the application of the NLMC and the Design Standards Technical Manual (the DSTM)[4] to the procedure the Noth Logan City Planning Commission (the Planning Commission) and the North Logan City Council (the City Council) use to determine if an Improper Lot meets development regulations:

> Upon receipt of a request for Post-Division Review, the Planning Commission and City Council shall determine if the Improper Lot meets the Development Regulations found in [the NLMC] and the [DSTM] based on the Development Regulations and requirements required at the time of the Post-

---

4. The City explains in its brief that the DSTM is a document "published separately from the [NLMC]" that provides "the engineering and technical requirements for infrastructure improvements."

> Division Approval. If the Improper Lot does not meet these Development requirements, improvements must be designed and constructed to meet all applicable regulations in [the NLMC] and the [DSTM].

*Id.* § 12D-207(C).

¶9 Subsection D limits improvements that may be required to be made to the Improper Lot to those found in the NLMC or the DSTM:

> Except as required in subsection E immediately below, any improvements or dedications required in connection with an approval of the Improper Lot pursuant to a Post-Division Review shall be limited to those improvements or dedications that are required by the Development Regulations found in [the NLMC], and the [DSTM] and that are located on the Improper Lot. Each Improper Lot created as a part of an Improper Subdivision must be part of a Post-Division review at which time the improvements or dedications required for that Improper Lot may be imposed on that particular Improper Lot.

*Id.* § 12D-207(D).

¶10 And the fifth and last part of the Ordinance, subsection E, regulates the overall development of Improper Lots and Parent Lots, and it requires that

> [t]he Improper Lot(s) and Parent Lot(s) conform with all other land use ordinances including but not limited to; lot size, width, access and frontage for the zone in which it is located at the time of application for Post-Division Review.

*Id.* § 12D-207(E).

*The Recommendation of the Planning Commission*

¶11 The Planning Commission considered Strebel's application at meetings in December 2021 and January 2022. At the January meeting, the Planning Commission voted "to make a negative recommendation" to the City Council on the approval of Strebel's application.

¶12 The Planning Commission's negative recommendation was accompanied by a report (the Report) written by the City Planner that addressed each subsection of the Ordinance. The Report concluded that the Improper Lot met all the requirements of subsection B but fell short at subsection C. Specifically, the Report stated, "Access is the only concern for this application. In the [DSTM] and Fire code[,] . . . a minimum of twenty (20) feet in width for an access road" is required. The Report explained that while the "length of road from the canal crossing east to the property [met] the required twenty (20') in width," the "length of road from the canal crossing west to 1600 East [varied] in width along its length," from "16 feet at the widest, [with] most areas measuring at 14–15 feet, and the most narrow found just west of the canal at 13 feet."

¶13 The Report concluded with this factual finding related to the application: Section "12D-114 within the [NLMC] requires that adequate access be provided to each lot," but "the drivable access road to the [Lot] is not currently the 20 feet in width excluding shoulders that is required as measured by city staff (Public Works, Engineering, Fire, Admin)." Section 12D-114 concerns improvements for subdivisions; it states that "[i]mprovements shall be required and constructed in accordance with the [DSTM]." And among required improvements, it lists "[s]treets and roads providing adequate frontage and access to all lots." NLMC § 12D-114(A)(4).

*Consideration by the City Council*

¶14 About two weeks after the Planning Commission's negative recommendation, the City Council considered Strebel's application. At that meeting, the City Planner directed the City Council's attention to the Report, stating, "[T]he one thing in [the Report] that we wanted to . . . point out is access," specifically noting, "[The Lot] does need to meet the rest of our development codes, that includes adequate access as defined in our code." The City Planner went on to point out that "the minimum width fire code-wise for this would be . . . 20 feet paved." He then reported that Lower 2500 North averaged only 15 feet wide, with the narrowest portions being 13 or 14 feet and the widest point being 16 feet. He further noted that the road was only 11 feet when plowed of snow owing to the proximity of the adjacent fences.

¶15 City Council members then spent some time discussing access issues surrounding 2500 North with the City Planner. Much of this discussion focused on the width of 2500 North being sufficient to allow access during a fire emergency. Strebel addressed the City Council, disputing that the access was inadequate under the NLMC to allow emergency services to reach the Lot: "We're not talking about fire, but just access. And . . . all that [the NLMC] says is that you have to have adequate access to get to your home." He went on to assert, "And I don't know how you can argue that there's not adequate access to get to our home when people drive back and forth to that cemetery all the time. And the nine people that [already] live on that road, they have adequate access to their homes." In response, one City Council member said that she felt like they were "stretching the definition of adequate" when the "bare minimum adequate access needs to be [the] fire code" requirement of 20 feet in width. However, the mayor of the City acknowledged at the meeting that she thought "there is some ambiguity . . . about adequate access" and that she did not "think that there's a clear right answer here" in reference to the City's regulations, observing, "[W]e all appreciate . . . the

complexity of this." Ultimately, the City Council voted to deny the application because "it [did] not meet the code."

*Appeal to the Hearing Officer*

¶16    Strebel appealed the denial to the City's Administrative Appeals Hearing Officer (the Hearing Officer). Strebel filed a memorandum in support of his appeal. In this memorandum, Strebel asserted that the NLMC "appears to only require access not adequate access." From this, he argued that his application was "in full compliance" with the "applicable ordinances and codes" and that there was a "lack of a specific basis for the determination of inadequacy."

¶17    At the hearing held in late February 2022, the City's counsel argued that the "access" needed to not just be "adequate" but that it had to also meet the standards required by the DSTM. And the "smallest road width available" in the DSTM is the "rural roads option, which requires 22 feet of asphalt and 2 feet of curb on each side, . . . plus some swell or landscape" on the side, resulting in a "38-foot easement or access area."

¶18    The Hearing Officer upheld the denial of the application. He concluded, "The record on appeal includes substantial evidence for each essential finding of fact made by the City Council. The City Council's interpretation and application of the relevant land use ordinances was correct." He further concluded that subsection C "plainly restricts approval of the application for subdivision because the development regulations in [the NLMC and the DSTM] are not satisfied."

*Appeal to the District Court*

¶19    Strebel timely filed a petition for review of the Hearing Officer's decision with the district court. Strebel argued that subsection C did not apply to the width of a road some distance away from the Lot because that subsection was limited to the Lot

itself: "Upon receipt of a request for Post-Division Review, the Planning Commission and City Council shall determine if *the Improper Lot* meets the Development Regulations found in [the NLMC and the DSTM] based on the Development Regulations and requirements required at the time of the Post-Division Approval." NLMC § 12D-207(C) (emphasis added). Strebel asserted that the City Council was to determine only if the Lot itself complied with the requirements and that the City Council could not extend this determination to offsite compliance, namely the width of Lower 2500 North. Thus, Strebel took issue with the denial of the application because the City Council's "focus [was] *not* the requirements or improvements located *on* the [Lot]" but instead on "*offsite* street improvements far removed from the [Lot]."

¶20 The district court upheld the Hearing Officer's decision. In addressing section 12D-114(A)(4), the court noted that Strebel argued the provision required only access to a public road while the City maintained it required access to the entirety of 2500 North. The court concluded that the Hearing Officer correctly interpreted subsection C as it related to section 12D-114(A)(4), meaning that "adequate access" includes access from the Lot to the rest of the City: "[A]dequate access would include the entirety of [2500 North] because [Upper 2500 North], alone, does not give [the Lot] access to a main road, only [Lower 2500 North] connects to a main road. [Lower 2500 North] was correctly considered when the Hearing Officer applied" the requirement from the DSTM on the minimum width.

## ISSUE AND STANDARD OF REVIEW

¶21 Strebel appeals, asserting that "the district court erred in concluding" that the City Council and Hearing Officer "(i) properly construed a land use ordinance as requiring 'adequate access' when the ordinance itself included no such requirement, and (ii) properly denied . . . Strebel's land use application based

on that erroneous construction." "When a district court reviews an order of a local land use authority and we exercise appellate review of the district court's judgment, we afford no deference to the district court's decision." *Outfront Media, LLC v. Salt Lake City Corp.*, 2017 UT 74, ¶ 12, 416 P.3d 389 (cleaned up). "We review the interpretation of ordinances for correctness as well." *Id.*[5]

ANALYSIS

¶22 A municipal land use decision is invalid if a court determines it to be "illegal." *See* Utah Code § 10-9a-801(3)(b)(ii). Here, Strebel asserts that the City's decision was illegal because it was based on a misinterpretation of the law. A "land use decision is illegal" when it "is based on an incorrect interpretation of a land use regulation" or "is contrary to law." *Id.* § 10-9a-801(3)(c)(ii); *see also Outfront Media*, 2017 UT 74, ¶ 12. "The fundamental consideration in interpreting legislation, whether at the state or local level"—a city ordinance in this case—"is legislative intent." *Springville Citizens for a Better Cmty. v. City of Springville*, 1999 UT 25, ¶ 29, 979 P.2d 332. And the best evidence of legislative intent "is the plain language of the . . . ordinance itself." *Ferre v. Salt Lake City*, 2019 UT App 94, ¶ 14, 444 P.3d 567 (cleaned up). It is well-established that "we read the plain language of the ordinance as

---

5. The City spends significant energy encouraging us to adopt a more deferential standard of review. *See Carrier v. Salt Lake County*, 2004 UT 98, ¶ 28, 104 P.3d 1208 ("We . . . review a local agency's interpretation of ordinances for correctness, but also afford some level of non-binding deference to the interpretation advanced by the local agency."), *abrogated by Outfront Media, LLC v. Salt Lake City Corp.*, 2017 UT 74, 416 P.3d 389. But we are bound to follow the standard articulated by the Utah Supreme Court in *Outfront Media. See State v. Sundara*, 2021 UT App 85, ¶ 60, 498 P.3d 443 ("[T]his court lacks the authority to overrule Utah Supreme Court precedent.").

a whole and interpret its provisions in harmony with other ordinances in the same chapter and related chapters." *Id.* (cleaned up); *see also LPI Services v. McGee*, 2009 UT 41, ¶ 11, 215 P.3d 135; *Miller v. Weaver*, 2003 UT 12, ¶ 17, 66 P.3d 592.

¶23     However, in the context of a land use decision, the playing field is not uniformly even. This situation arises because the Municipal Land Use, Development, and Management Act (MLUDMA), *see generally* Utah Code §§ 10-9a-101 to -1005, directs that "[i]f a land use regulation does not *plainly restrict* a land use application, the land use authority shall interpret and apply the land use regulation to favor the land use application," *see id.* § 10-9a-306(2) (emphasis added); *id.* § 10-9a-707(4)(b) ("The appeal authority shall . . . interpret and apply a land use regulation to favor a land use application unless the land use regulation *plainly restricts* the land use application." (emphasis added)). The question before us, then, is whether the Ordinance "plainly restricts" Strebel's application. If it does not, the Ordinance should be interpreted in favor of granting Strebel's application.[6]

---

6. The City asserted at oral argument that these provisions requiring the interpretation of a land use regulation in favor of the application apply only at the administrative stage and do not apply to judicial review because Utah Code section 10-9a-801, which addresses judicial review, does not separately contain this requirement. The City's argument in this respect is unpersuasive. Section 10-9a-801 explicitly states that the reviewing "court shall presume that a final land use decision of a land use authority or an appeal authority is valid unless the land use decision is: (i) arbitrary and capricious; or (ii) illegal." Utah Code § 10-9a-801(3)(b). Clearly, if the court is reviewing the decision of the appeal authority, which was required to interpret the land use regulation in favor of the application unless the regulation plainly restricted the proposed use, then it follows that the judicial review

(continued…)

¶24 Strebel argues that the City Council was required to approve his application because the Lot "satisfied all applicable requirements under" the Ordinance. As Strebel sees it, the error of the City Council—which he argues extended to the Hearing Officer's and the district court's determinations—was in considering off-lot conditions, namely, the width of Lower 2500 North. Strebel contends that the plain meaning of the Ordinance "limited the [City] Council's review to determining whether [the Lot]—and only [the Lot]—complied with applicable design requirements." This alleged error, Strebel maintains, rendered the City Council's decision "illegal" because it was "based on an incorrect interpretation of a land use regulation" or "contrary to law." *See id.* § 10-9a-801(3)(c)(ii). Strebel argues that his assertion that nothing in the Ordinance authorized consideration of off-lot conditions "follows from the text and structure of [the Ordinance] and common sense."

---

of the appeal authority's decision proceeds under this same requirement. "Furthermore, because zoning ordinances are in derogation of a property owner's common-law right to unrestricted use of his or her property, provisions therein restricting property uses should be strictly construed, and provisions permitting property uses should be liberally construed in favor of the property owner." *Patterson v. Utah County Board of Adjustment*, 893 P.2d 602, 606 (Utah Ct. App. 1995). And we too proceed under the same provision given that we are reviewing the decision of the district court. *See Outfront Media*, 2017 UT 74, ¶ 12 n.8 ("The lack of deference [afforded the district court's review of a land use authority's decision] . . . does not mean that we are not in fact reviewing the decision of the district court. So, . . . when we exercise appellate review of a district court's judgment in connection with judicial review under Utah Code section 10-9a-801, we review the intermediate court's decision." (cleaned up)).

¶25  We largely agree with Strebel because the Ordinance does not "plainly restrict" Strebel's application such that it authorized the City Council to analyze off-lot conditions (here, whether the width of a distant road was sufficient to provide adequate access to the Lot) in determining if his application should be approved.

A.    The Ordinance itself does not "plainly restrict" Strebel's application.

¶26  The mayor of the City admitted that the city ordinances in this matter were plagued by at least "some ambiguity" and that she did not "think that there's a clear right answer here" when Strebel's application was being considered by the City Council. And before the district court, while asserting that the Ordinance was "fairly straightforward," the City's attorney nevertheless conceded that "[t]here is some ambiguity in the language." Moreover, even in its brief on appeal, the City continues to admit that the Ordinance "may not have been expertly drafted."[7] We agree with the City's characterization that the Ordinance is ambiguous. A consequence of this ambiguity is our conclusion that the Ordinance does not plainly restrict Strebel's application—at least not for the sole reason identified by the City, which was that the Lot does not have adequate access.

¶27  First, the plain text of the Ordinance defines the term "Improper Lot" in the singular to mean "[a] lot, plot, tract of land, or parcel that was subdivided without complying with the applicable requirements of this chapter." NLMC § 12D-207(A)(3). Strebel advances a convincing argument on this point. From this use of the singular, Strebel argues, "By limiting the meaning solely to the lot itself, the definition confirms that [subsection C's] reference to 'the Improper Lot' does not include off-lot

---

7. The City said essentially the same in its brief submitted to the district court: "While the Ordinance is admittedly not the most artfully drafted, [its] sections do not conflict with one another."

conditions." Strebel concludes, "[T]he word 'the' before 'Improper Lot' particularized the [City] Council's review to '*the* Improper Lot,' meaning [the Lot]. It functioned to restrict the [City] Council's review to [Strebel's] property and precluded it from considering conditions beyond [the Lot]." The express terms of subsection C state that "the Planning Commission and City Council shall determine if *the Improper Lot* meets the Development Regulations found" in the NLMC and the DSTM "required at the time of the Post-Division Approval." *Id.* § 12D-207(C) (emphasis added). Nothing in the plain text of subsection C suggests that the City is authorized to consider off-lot conditions in this analysis.

¶28 Second, the overall structure of the Ordinance confirms the reading Strebel advances, namely that the City Council was limited to assessing the condition on only the Lot. Subsection D states that the review undertaken by the City Council "shall be limited to those improvements or dedications that are required" by the NLMC and the DSTM and that are "located on the Improper Lot." *Id.* § 12D-207(D). Moreover, subsection D expressly provides that the "improvements or dedications required for that Improper Lot may be imposed on that particular Improper Lot." *Id.*

¶29 Strebel argues that this language lends support to his assertion that the City Council is restricted to assessing improvements *on* the Improper Lot. More specifically, Strebel asserts, the City Council's "review was restricted to determining whether [the Lot] complied with applicable development regulations." His argument in this respect is persuasive. It is well-settled that "we do not view individual words and subsections in isolation; instead, our statutory interpretation requires that each part or section be construed in connection with every other part or section so as to produce a harmonious whole." *State v. Hatfield*, 2020 UT 1, ¶ 16, 462 P.3d 330 (cleaned up); *see also State v. Maestas*, 2002 UT 123, ¶ 54, 63 P.3d 621 ("A statute is passed as a whole and not in parts or sections and is animated by one general purpose

and intent." (cleaned up)). Here, the interrelationship between subsections C and D supports a reading of the Ordinance that the City Council's authority to require improvements is strictly circumscribed to on-lot conditions. Indeed, subsection D is explicit in its choice of words: it states that required improvements are "limited" to those "located on the Improper Lot" and provides only that they can be imposed "on that particular Improper Lot." NLMC § 12D-207(D).

¶30    The provision in subsection E does not change the conclusion that improvements are limited to on-lot conditions. That subsection requires "Improper Lot(s) and the Parent Lot(s) [to] conform with all other land use ordinances including but not limited to; lot size, width, access and frontage for the zone in which it is located at the time of application for Post-Division Review." *Id.* § 12D-207(E). It's important to note that subsection E is situated as the gateway to subsection D. *See id.* § 12D-207(D) ("Except as required in subsection E immediately below, . . ."). And subsection D, as we just explained, is strictly limited to on-lot improvements. The most natural reading of the Ordinance, given this context, is that subsection E merely allows the City to ensure that approving the improper lot will not create access issues for the Parent Lot or other lots that were created in the improper subdivision, for example, a situation where approving one improper lot might completely cut off access to the Parent Lot or other lots. Nothing in the subsection suggests that the City Council should consider off-lot conditions outside of this narrow exception.

B.    The provisions of the DSTM do not "plainly restrict" Strebel's application.

¶31    Thus, under the terms of the Ordinance, the provisions of the DSTM are applicable only to the improper lot. The DSTM

itself—at least that part of it in the record submitted to us[8]—does not purport to establish a nexus between the width of a road and adequate access to a lot in a subdivision some distance away from the road in question. That connection, insofar as it does exist, appears to have been drawn by the City's representatives in referencing the standards for a rural road in the DSTM. Insofar as we can tell from the record, the DSTM merely provides the specifications for a rural road. It doesn't mention that its road specifications are in any way related to access to lots in subdivisions, and certainly not in a way that "plainly restricts" Strebel's application.

C.     Section 12D-114 likewise does not "plainly restrict" Strebel's application.

¶32     The City argues that because subsection E requires an assessment of whether the Improper Lot complies "with all other land use ordinances," *see id.* § 12D-207(E), when it comes to access, section 12D-114(A)(4) comes into play. As previously noted, that section states that "[i]mprovements shall be required and constructed in accordance with the [DSTM]." *Id.* § 12D-114(A). Among required improvements, section 12D-114 lists "[s]treets and roads providing adequate frontage and access to all lots." *Id.* § 12D-114(A)(4). And as the Hearing Officer indicated, the DSTM has a minimum width for rural roads of 22 feet. But we conclude, contrary to the City's assertion, that the Ordinance limits the

---

8. The record has only a few pages from the DSTM that was in effect at the time of Strebel's application. For the current version of the DSTM, see *Design Standards Technical Manual (DSTM)*, North Logan, https://s3-us-west-2.amazonaws.com/municipalcodeonline.com-new/northlogan/designtechmanual/documents/1709141515_North%20 Logan%20City%20Design%20Standards%20Technical%20Manual%20 (DSTM)%20240117.pdf [https://perma.cc/465X-DYZK].

applicability of section 12D-114, insofar as it is applicable at all, to on-lot conditions.

¶33     First, the plain text of the Ordinance is far from clear that section 12D-114 even applies. On the contrary, the Ordinance states, "Upon receipt of a request for Post-Division Review, the Planning Commission and City Council shall determine if the Improper Lot meets the Development Regulations found in [the NLMC]." *Id.* § 12D-207(C). But "Development Regulations" is the title of section 12D-115, which addresses a wide variety of items related to development but does not mention access to lots. *Id.* § 12D-115. The Ordinance does not reference section 12D-114 either by its descriptive title or its section number. While this does not definitively mean that section 12D-114 does not apply, it does mean that the plain text of the Ordinance in no way would lead one to conclude that it does. Instead, the plain text of the Ordinance explicitly invokes section 12D-115's title. All this is to say that because the Ordinance does not "plainly restrict" Strebel's application, the Ordinance should be interpreted and applied "to favor the land use application," *see* Utah Code §§ 10-9a-306(2), -707(4)(b), at least insofar as section 12D-114 is concerned. In other words, the City cannot use section 12D-114 to assert that the Ordinance plainly restricts Strebel's application because its applicability to the Ordinance is dubious at best.

¶34     Moreover, even if it is applicable, nothing in section 12D-114 establishes that its regulations apply to conditions outside of the subdivision in question. On the contrary, the language of section 12D-114 indicates that its provisions apply to improvements within the subdivision. The title of the section is "Subdivision Improvements Required." NLMC § 12D-114. And the section expressly states, "The improvements required by this ordinance apply to all subdividers and to all persons that purchase, lease, rent or receive any interest in any land which is located *within a subdivision.*" *Id.* § 12D-114(B) (emphasis added). Given the overall structure of the section, the applicability of the

specific subsection concerning streets and roads (requiring "[s]treets and roads providing adequate frontage and access to all lots") is more readily understood as meaning that the roads *within* the subdivision provide access to all lots rather than requiring roads external to the subdivision provide adequate access. *See id.* § 12D-114(A)(4). This conclusion is further bolstered by the current version of the section, which expressly states that improvements "on existing and proposed streets" are limited to those "in all proposed subdivisions." *Id.* § 12D-116(A)(6) (2025).[9] In sum, nothing in section 12D-114—either in its past or present incarnations—would lead us to conclude that improvements reach to conditions outside the subdivision in question. In fact, the contrary conclusion is the more natural reading.

¶35    Given that the Ordinance, the DSTM, and section 12D-114—even when read together—do not plainly restrict Strebel's application, these land use regulations should have been interpreted and applied in favor of the application. *See* Utah Code §§ 10-9a-306(2), -707(4)(b). In light of the Ordinance's ambiguity and the questionable applicability of the DSTM and section 12D-114, these land use regulations clearly were not so interpreted and applied. Instead, the City engaged in what can only be described as a rather strained analysis to tie the three together to reach the conclusion that the Ordinance applied to off-lot conditions. Because the City's conclusion was based on such a tenuous excursus into questionably applicable regulations, it can hardly be said that the Ordinance plainly restricted Strebel's application.

---

9. For the current version of the NLMC land use ordinances, which includes regulations and requirements for subdivisions, see North Logan City, Utah, *Municipal Code* ch. 12 (2025), https://northlogan.municipalcodeonline.com/book?type=ordinan ces#name=12_Land_Use [https://perma.cc/6648-UESB].

CONCLUSION

¶36 When read as a whole, the plain text of the Ordinance limited the City to analyzing on-lot conditions in deciding whether to approve Strebel's application. At the very least, the Ordinance, the DSTM, and section 12D-114 did not plainly restrict Strebel's application. Instead, given the apparent ambiguity of these land use regulations, they should have been applied and interpreted in favor of Strebel's application. We therefore reverse and remand this matter to the district court with instructions to reverse the City's denial of Strebel's application for failure to meet the requirements of the Ordinance.[10]

––––––––––

10. In reaching this conclusion, we take no position on whether Strebel's application to develop the Lot met the other requirements of the NLMC or other land use regulations. Our opinion addresses only whether Strebel's application met the requirements of the Ordinance. In other words, we are not saying Strebel's application should have been approved when considered in light of all the NLMC requirements and other regulations of the City for the issuance of a building permit. That determination is beyond the scope of the issue on appeal. Rather than saying his application should have been approved, we are saying that his application should not have been denied, on the access-related grounds advanced by the City, insofar as the terms of the Ordinance are concerned. Accordingly, our opinion is strictly cabined by these parameters.