**2025 UT App 130**

# THE UTAH COURT OF APPEALS

VR CPC HOLDINGS INC.,
*Appellant,*

*v.*

PARK CITY MUNICIPAL CORPORATION,
*Appellee,*

CLIVE BUSH, ANGELA MOSCHETTA, AND MARK STEMLER,
*Intervenors and Appellees.*

Opinion
No. 20240065-CA
Filed August 28, 2025

Third District Court, Silver Summit Department
The Honorable Richard E. Mrazik
No. 220500240

Brent N. Bateman, Tyler R. Cahoon, Kathryn A.
Reilly, and Ryan W. Cooke, Attorneys for Appellant

Lara A. Swensen and Mitchell A. Stephens,
Attorneys for Appellee

H. Craig Hall, Hyrum J. Bosserman, and Kimberly A.
Smith, Attorneys for Intervenors and Appellees

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and AMY J. OLIVER concurred.

MORTENSEN, Judge:

¶1     VR CPC Holdings Inc., doing business as Park City Mountain (the Resort), attempted to use an expedited administrative process to obtain conditional approval of an alteration to its ski lifts through an administrative conditional use permit (ACUP). In contrast to the normal process for obtaining a conditional use permit, the ACUP allows for approval by the Park

City Planning Director (the Director), subject to review by the Park City Planning Commission (the Commission). Initially, the Resort's effort succeeded when the Director approved the Resort's ACUP application, but some local citizens intervened and challenged the approval before the Commission. The Commission, on its review, concluded that the Resort had not met the requirements to utilize the ACUP process and therefore denied the Resort's request. The Resort then sought review in the district court. The district court concluded that the Commission had not acted arbitrarily or capriciously in deciding that the Resort had not met the requirements to employ the ACUP process. Now, reviewing the matter independently, we reach the same conclusion as the district court and affirm.

BACKGROUND

¶2      Park City Municipal Corporation (Park City) has enacted the Land Management Code (the Code), which governs land use within the city. Under the Code, before a landowner can develop a conditional use, it must apply for and obtain a conditional use permit. Park City, Utah, Land Management Code §§ 15-1-8, -10. Typically, the Commission reviews proposed conditional uses and, after a public hearing, determines if the proposed use complies with the Code. *Id.* § 15-1-10. But the Code provides an alternative route for conditional use approval—the ACUP process. Under this alternative route, the Director considers and rules on conditional use applications instead of the Commission, but the Director's decision is still subject to the Commission's review. *Id.* §§ 15-1-10, -11.

¶3      In 1998, Park City entered into a Development Agreement, which incorporated an existing Mountain Upgrade Plan (the Upgrade Plan) with the Resort. The Development Agreement grants the Resort "a vested right to develop" its ski resort in accordance with the Development Agreement's terms. The Upgrade Plan sets forth a "lift upgrading program," which

contemplates the "replacement and/or reconfiguration of several . . . existing lifts" to "[m]odernize lifts and balance them with the available downhill terrain" and to "improve out-of-base lift capacity . . . and overall skier circulation."

¶4 Under the Development Agreement, "[d]evelopment of the skiing and related facilities as identified in the [Upgrade Plan] is a conditional use" and is "subject to administrative review and approval." Under the Development Agreement, the Resort can successfully use the expedited ACUP process as long as the application satisfies six criteria. The anticipated process entails the Director's review of an ACUP application to determine whether the proposed use meets each of the six criteria. If the Director determines that an application satisfies the six criteria, the use may be approved. At issue in this case are Criterion One and Criterion Six.

¶5 Criterion One requires,

> Consistency with the [Upgrade Plan]. The selection of lift transportation type shall be at the sole discretion of the Developer.

Criterion Six requires,

> At all times Developer shall assure that it has adequate parking or has implemented such other assurances, as provided in the Parking Mitigation Plan, to mitigate the impact of any proposed expansion of lift capacity.

¶6 In 2022, the Resort applied for an ACUP to replace one lift and upgrade another. As a part of its application, the Resort submitted information regarding the comfortable carrying capacity (CCC) of the ski operation at the Resort and how the CCC would be impacted by the proposed improvements. The Resort stated in its application that the "CCC is a number that describes

the comfortable daily carrying capacity of the ski lifts at a ski area, expressed in the unit 'skiers per day.'" And the Resort stated, that "the CCC calculation is simply a model that describes the theoretical capacity of the ski area that would provide a good skier experience." The Upgrade Plan approved a maximum CCC of no more than 13,700 for the Resort. According to the Resort's application and supplemental materials, the proposed improvements would increase the Resort's overall CCC by 2.5%—from 12,570 to 12,860.[1] However, the Resort maintained that there would be "no impact to parking associated with [the upgraded] lifts" because "[a]n increase in CCC [would] not directly cause an increase in business or in demand."

¶7     The Director reviewed the Resort's application. According to the Resort, the Director "analyzed [its] application for over three months"; "required [the Resort] to develop a transformative Parking Mitigation Plan [and] retain an outside consultant, in addition to the two consultants the [Resort] had previously retained"; "sought public comments"; "reviewed input"; and "held a lengthy public hearing."

¶8     As for the Parking Mitigation Plan, the Director explained in her approval of the ACUP, "Although [the Resort's] analysis of increased CCC does not indicate there will be an increase in parking demand associated with the proposed lift upgrades, [the Resort] was required to submit a Parking Mitigation Plan" pursuant to the Development Agreement and section 15-4-18(B)(6) of the Code. The Resort's Parking Mitigation Plan consisted of a document outlining the new paid parking system that the Resort's experts asserted would decrease parking needs by 11% through increasing average vehicle occupancy (AVO) and encouraging public transit use. The Parking Mitigation Plan included a spreadsheet that lists the parking needs for the Resort

---

1. An increase from 12,570 to 12,860 represents a 2.3%—not a 2.5%—increase.

in terms of CCC and includes the 2.5% increase as a part of its baseline calculation. The spreadsheet then demonstrates that if one subtracts guests who access the Resort without a parking spot, then divides that number by 2.7 (the AVO under the Parking Mitigation Plan), then subtracts the 11% parking-spot need reduction achieved by the Parking Mitigation Plan, one ends up with a surplus of 102 spots.

¶9 The Director ultimately concluded that the requested upgrades satisfied the Development Agreement's six criteria and granted the ACUP, subject to certain conditions. As for Criterion Six, the Director concluded, "The [Resort] submitted a [Parking Mitigation Plan] dated April 19, 2022, stating that [the Resort] will implement paid parking with a regulated reservation system starting the 2022/2023 ski season. This plan proposes to increase [AVO], carpool and transit use, and more effectively manage traffic and parking impacts. The [Director] finds that the [Parking Mitigation Plan] mitigates the impact of the lift upgrades."

¶10 Pursuant to section 15-1-18 of the Code, a group of citizens (the Intervenors) appealed the Director's decision to the Commission (the Administrative Appeal). The Intervenors argued that the ACUP application failed to satisfy Criterion One and Criterion Six. Specifically, the Intervenors argued that under the Development Agreement, the Resort must continually assure "that it has adequate parking" or has otherwise implemented plans "to mitigate the impact of ANY proposed expansion of lift capacity." The Intervenors specified that the Resort's Parking Mitigation Plan was problematic because it claimed a surplus of parking based on basic CCC numbers and did not consider "peak ski day numbers." The Intervenors also claimed that the Resort's plan did "not assure adequate parking and that paid parking without appropriate transit upgrades [would be] insufficient as a mitigation strategy." The Intervenors went on to raise other issues with the Resort's proposed Parking Mitigation Plan. These concerns included questions about the overflow parking available

through the Park City School District, the questionable "comparability of other resorts and their paid parking" that the Resort used to develop the Parking Mitigation Plan, and the lack of a "third party or qualified engineering review of the [Parking Mitigation Plan] to assure its integrity."

¶11 The Commission held two public hearings on the Administrative Appeal, during which it heard from the Intervenors, the Resort, and other community members. At one of the hearings, one member of the Commission noted that "nothing [had] been presented by" the Resort to give him "the information to do the math" and that he "would like to see the current formula with the inputs" so that the Commission "could actually verify" the calculations relied on by the Director. Ultimately, the Commission concluded, "[T]he total operating CCC has not been verified and/or defined. As a result it is not possible to accurately assess the required parking and other mitigation measures."

¶12 The Commission found that the Director "erred in determining the ACUP" complied with Criterion One and Criterion Six of the Development Agreement. As for Criterion One, the Commission found, "The alignment of the new . . . lift is not the same as shown in the [Upgrade Plan], as it does not go to the Meadow area. The new . . . lift is therefore not consistent with the [Upgrade Plan]." As for Criterion Six, the Commission made several findings:

- "The lease for additional parking at Park City High School is available a maximum of eight days per month limited to weekends and holidays and not to include consecutive weekends and is, therefore, insufficient to properly mitigate the increased parking demand which overflowed at least 68 days during the 2021/22 ski season. The number of stalls to be used was not defined, and therefore insufficient to properly mitigate."

- "The paid parking mitigation plan was based on unconfirmed CCC numbers and ski resort data that is not satisfactorily comparable to Park City in terms of access and controls for parking. Therefore, the assumed 11% reduction in [AVO] is in error."[2]

- "The City's consultant, EcoSign, did not verify actual calculations, and review was limited to the data and tables provided by [the Resort]."

- "The [Upgrade Plan] specifies 200 stalls, plus the Sweetwater site, to be used by employees of [the Resort], but these stalls are not accounted for in the Parking Mitigation Plan, and parking mitigation therefore is insufficient."

Thus, the Commission denied the Resort's application.

¶13   The Resort petitioned for review of the Commission's decision with the district court. There, the Resort argued that the Commission did not give sufficient weight to the Resort's experts on the CCC calculations and parking mitigation implications. The Resort further accused the Commission of having yielded to public clamor. Finally, the Resort argued that the Intervenors did not raise the issues regarding CCC or lift alignment in the Administrative Appeal and that those issues were therefore not preserved for judicial review.

¶14   At a hearing on the Resort's petition, the district court stated that whether the Commission acted in an arbitrary and

---

2. That there would be an assumed 11% reduction in AVO appears to be a misstatement. In fact, the Parking Mitigation Plan changes the AVO from 2.3 to 2.7, an increase of about 17%, while claiming an 11% reduction in the overall parking demand could be achieved. Thus, all else being equal, the *reduction* in parking demand is based, at least in part, on an *increase* in AVO.

capricious manner "turns on whether the [C]ommission's decision was supported by substantial evidence." The court continued, "If it was, it wasn't arbitrary and capricious as it stands. If it wasn't supported by substantial evidence, then it was arbitrary and capricious and it needs to be reversed." The district court specifically addressed Criterion One and Criterion Six.

¶15    The district court did not rule on the Commission's findings regarding Criterion One because it concluded that the Intervenors had not adequately raised issues related to that criterion in the Administrative Appeal and therefore the issues were outside the scope of the district court's review. Specifically, the court determined that the City and the Intervenors' "arguments regarding consistency under [Criterion One, including] consistency with CCC totals and subtotals and lift alignment[,] [were] not properly inside the scope of appeal under" section 15-1-18 of the Code.

¶16    The district court found that "the parking issue [under Criterion Six was] properly within the appeal." The district court ruled on the parking issue as follows:

> [The Commission] was presented with evidence in the record that raised reasonable questions about the reliability of the expert analysis underlying [the Resort's] Parking Mitigation Plan and reasonable questions regarding the effectiveness of the Parking Mitigation Plan. . . . These are all comments made by the public that are not public clamor, but are reasonable concerns based on evidence in the record that cast doubt onto whether the expert analysis under the Parking Mitigation Plan was reliable.

¶17    The court concluded that "facts in the record reasonably support questions regarding the reliability of the expert analysis underlying the Parking Mitigation Plan, and reasonably support skepticism regarding the effectiveness of the Parking Mitigation

Plan proposed by [the Resort]." The district court thereby concluded that the Commission had not acted arbitrarily and capriciously when it determined that the Resort's application did not establish that Criterion Six had been met. The court therefore upheld the Commission's decision reversing the Director's grant of the ACUP.

¶18   The Resort appeals the district court's decision to this court.

## ISSUES AND STANDARD OF REVIEW

¶19   The Resort contends that the district court should have concluded that the Commission's decision was arbitrary, capricious, and illegal because it considered issues not raised in the Administrative Appeal. The Resort further argues that the district court should have concluded that the Commission's decision regarding Criterion Six was arbitrary, capricious, and illegal because it was not supported by the record and was contrary to law.

¶20   "When a district court reviews an order of a local land use authority and we exercise appellate review of the district court's judgment, we act as if we were reviewing the land use authority's decision directly, and we afford no deference to the district court's decision. Like the review of the district court, our review is limited to whether a land use authority's decision is arbitrary, capricious, or illegal." *Fox v. Park City*, 2008 UT 85, ¶ 11, 200 P.3d 182 (cleaned up).[3]

---

3. To clarify the scope of our review, the issues related to Criterion One are not before us. In the briefing on appeal, the parties sometimes ask us to look at the ruling of the district court and at other times ask us to examine the Commission's decision.

(continued…)

ANALYSIS

I. Criterion Six Preservation

¶21     The Resort argues that the "Intervenors' petition did not adequately raise on appeal the verification or accuracy of the CCC numbers." The Resort goes on to claim that because the CCC issue that the Intervenors did raise was not the basis of the Commission's decision, any "decision on that basis was necessarily outside the scope of [the Commission's] appellate authority."

---

Precedent is clear that "we act as if we were reviewing the land use authority's decision directly." *Fox v. Park City*, 2008 UT 85, ¶ 11, 200 P.3d 182. But we still look to the district court's resolution of the matter. As explained by our supreme court, "the fact that we afford no deference to the intermediate court does not obviate the need for parties to make and preserve below the arguments they wish to press on appeal." *Outfront Media, LLC v. Salt Lake City Corp.*, 2017 UT 74, ¶ 12 n.8, 416 P.3d 389. Here, the district court determined that Park City and the Intervenors' arguments regarding consistency under Criterion One were "not properly inside the scope of appeal . . . but [that] the parking issue" under Criterion Six was "properly within the appeal." We agree with the district court. The district court held that the Intervenors failed to preserve their arguments on compliance with Criterion One in the original appeal because, to the extent they raised the issue, they did so in a superficial and passing way that gave no indication that it constituted a discernable aspect of their original appeal or was in any way distinguishable from their concerns about compliance with Criterion Six. Accordingly, the district court made no determination as to Criterion One. We discern no error in this determination and independently reach the same conclusion.

¶22    The Commission found that the issue of Criterion Six was sufficiently preserved by the Intervenors' original challenge of the Director's decision. The district court likewise determined that the issue of compliance with Criterion Six was "properly within the appeal because that issue was raised in a way that complies with" the Code.

¶23    We agree with the district court (and the Commission) that the issues surrounding Criterion Six were preserved. The Code requires that any appeals to the Commission contain "a comprehensive statement of all the reasons for the appeal." Park City, Utah, Land Management Code § 15-1-18(F). The Code further explains that "[r]eview of petitions of appeal shall include a public hearing and shall be limited to consideration of only those matters raised by the petition(s)." *Id.* § 15-1-18(G). Thus, for the Commission to have properly considered Criterion Six, the Intervenors must have raised it in the Administrative Appeal.

¶24    In the Administrative Appeal, the Intervenors alleged that the proposed improvements did not satisfy Criterion Six. They argued, "[T]he [Development Agreement] makes clear that a Developer SHALL assure AT ALL TIMES that it has adequate parking or has implemented other assurances to mitigate the impact of ANY proposed expansion of lift capacity."

¶25    Not only did the Intervenors raise the general issue of Criterion Six, they specifically raised the issues on which the Commission would eventually base its decision, including challenges to the figures on which the parking need estimates were based, questions regarding parking at Park City High School, the comparability of resort data on which the Parking Mitigation Plan was based, and the lack of third-party verification of the Parking Mitigation Plan data.

¶26    Therefore, we agree with the district court's conclusion that "the parking issue under [Criterion Six was] properly within

the appeal because that issue was raised in a way that complies" with the relevant sections of the Code identified above.

## II. Record Evidence Supporting the District Court's Conclusion on Criterion Six

¶27 The district court aptly explained the review standard here: Whether the Commission's decision "was arbitrary and capricious turns on whether the . . . decision was supported by substantial evidence. If it was, it wasn't arbitrary and capricious as it stands. If it wasn't supported by substantial evidence, then it was arbitrary and capricious and it needs to be reversed." *See Bradley v. Payson City Corp.*, 2003 UT 16, ¶ 10, 70 P.3d 47 ("When a land use decision is made as an exercise of administrative or quasi-judicial powers, . . . we have held that such decisions are not arbitrary and capricious if they are supported by substantial evidence." (cleaned up)). The Utah Supreme Court has defined substantial evidence as "that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *First Nat'l Bank of Boston v. County Board of Equalization*, 799 P.2d 1163, 1165 (Utah 1990).

¶28 Here, the Commission's decision that the Director erred in determining that the ACUP application complied with Criterion Six of the Development Agreement was not arbitrary and capricious because it was, in fact, supported by substantial evidence.

¶29 Under Criterion Six, the Resort must assure that there is always adequate parking to mitigate the impact of any proposed expansion of lift capacity. Under this reading, Criterion Six requires that if any proposed expansion of lift capacity has an impact on parking, that impact must be mitigated by the Resort.

¶30 The Resort maintains that for Criterion Six to require anything at all, the proposed upgrades must have some impact on parking demand. And the Resort concedes that the proposed

upgrades here will result in increased lift capacity: the Resort's own experts "calculated a total net increase in CCC of only 290 (from 12,860 to 13,370) or 2.5%."[4] The dispute thus focuses on whether there is evidence on which the Commission might have concluded that an increase in CCC would also have had an impact on parking.

¶31    The Resort argues that the Commission's decision "was arbitrary and capricious because it presume[d] the lift upgrades would increase parking demand to begin with and thus require *any* mitigation." The Resort asserts that, in fact, the "upgrades would have *no impact* on parking demand," implying there would be nothing to mitigate. The Resort also maintains that an increase in CCC would not necessarily translate to an increase in parking demand. At oral argument, the Resort explained, "[O]ur position is firmly that there was zero evidence of any parking impact and therefore nothing to mitigate." The Resort's experts asserted that "there [will be] no impact to parking associated with these lifts," "meaning that there [will be] no need for additional day skier parking in the future condition." The Resort's experts explained,

> An increase in CCC does not directly cause an increase in business or in demand. If business levels remain the same, an increase in CCC will result in a better skier experience, with shorter lift lines and potentially marginally more skiing available for each skier due to less time waiting in the lift line. Due to the maximized use of the current accommodation and parking inventory at the base areas, business levels (& base area throughput) are

---

4. We note a problem with the Resort's math here. The difference between 13,370 and 12,860 is 510, not 290. And this difference represents nearly a 4% increase rather than a 2.5% increase. We assume the Resort meant to refer to the increase from 12,570 to 12,860, which represents a 2.3% increase. *See supra* note 1.

unlikely to rise in the short term unless measures are taken to increase the occupancy of the parked vehicles or increase transit/shuttle use to those base areas.

In summary, although there is not a direct effect on business levels due to an increase in CCC, that better skier experience will likely make skiing at the [R]esort even more attractive, which could be a factor in putting more pressure on the base areas.[5]

¶32 The Resort now relies on its experts' conclusion that an increase in CCC would not result in an increase in parking demand. This represents at least a shift in strategy, if not a shift in substance. After all, the Resort submitted a robust Parking Mitigation Plan that would seem to point in a different direction. But the Resort argues that it submitted this plan solely because the Director asked it to. The Resort now implies that it was never strictly required to submit a meaningful Parking Mitigation Plan because its proposed upgrades do not trigger the threshold requirement of Criterion Six—namely, that its improvements will

---

5. Though it is not determinative to our conclusion, the experts' analysis gives us pause. If we understand the analysis correctly, the experts appear to conclude that without sufficient parking at the Resort, overall business is not likely to increase, and so therefore the Resort has no obligation to submit a plan to provide more parking. In other words, the experts seem to say, the Resort has already maxed out the current parking and therefore doesn't need to provide any more parking. Under that reasoning, as long as the Resort is not providing adequate parking, it will never have to provide parking mitigation. On top of that, it seems odd and illogical for the experts to suggest that the Resort is simply working to make the skier experience more pleasant but that there's no reason to believe that those efforts will attract more skiers.

have some impact on parking. Thus, the Resort essentially argues that *any* Parking Mitigation Plan would be sufficient because it would be weighed against the zero impact that the improvements would have and, therefore, the Commission acted arbitrarily and capriciously when it determined otherwise. Under the Resort's view, while it was required to submit a Parking Mitigation Plan, the plan it submitted could have literally said, "These improvements will have no effect on parking so our plan to mitigate is to do nothing."

¶33 But that's not what the Resort did. Instead, the Resort submitted an elaborate Parking Mitigation Plan, with the assistance of multiple expert consultants, which proposed strategies to implement a paid parking system that would in turn increase the AVO (or average vehicle occupancy) of cars parking at the Resort and would decrease the number of parking spaces needed.

¶34 Based on all this, we understand the Resort's argument to be that the proposed improvements will have zero impact on parking demand. But the Resort asserts that even if the proposed improvements would have some incremental impact on the demand for parking, it doesn't matter because the Resort will commit to a Parking Mitigation Plan that completely mitigates that small increase. Indeed, the Resort's Parking Mitigation Plan assumes as much—it factors the 2.5% increase in CCC into its calculation of required parking spaces. We thus presume that the Resort maintains that it never conceded that an increase in CCC would translate into an increase in parking demand and that it was simply putting forth the increased CCC number for the sake of argument to demonstrate its point that even if there were an increase, the Parking Mitigation Plan would mitigate it.

¶35 On appeal, the Resort argues that the efficacy of its Parking Mitigation Plan is not at issue and cannot be the subject of review because the improvements will have no impact on parking, which

avoids triggering any requirement under Criterion Six. This argument fails for several reasons. First, the Parking Mitigation Plan was in evidence and was therefore properly considered by the Commission. Second, the Resort has failed to show that the Parking Mitigation Plan was so immaterial and irrelevant that the Commission's consideration of the plan itself would be arbitrary and capricious. Third, the Resort's position before the Director—whose decision was actually being reviewed by the Commission—never asserted that the Parking Mitigation Plan was merely a perfunctory requirement. Indeed, when the Director required a Parking Mitigation Plan, the Resort never argued that such a plan was unnecessary under the circumstances.

¶36    From our review of the record, it does not appear that the Director (or anyone other than the Resort's experts) ever determined that the proposed improvements would have no impact on parking. Rather, the Director never had to reach this issue because she found that the Resort's plan sufficiently mitigated any impact. And the only reason the Director was able to avoid the question of whether an increase in CCC would result in an increase in parking demand is that the Resort assumed an increased CCC *would* increase parking demand. That the Resort is now describing the framework as theoretical does not change that it did not make this point to the Director.

¶37    Theoretical though it may have been for the Resort, it is this factual set of assumptions that the Director proceeded under and that was assumed at every step of review thereafter. Simply stated, a party cannot insulate its primary argument from review at lower levels and then claim that the argument is determinative on appeal.

¶38    But that is exactly what the Resort has done here. We acknowledge that it argued to the Director that there would be no impact on parking, but it provided the Director with an alternative basis to approve its application, and that is the basis

under which the parties have been operating. In its ACUP application, the Resort assumed that the increase in CCC would have an impact on parking, even if the result of that impact was minimal. That position was successfully maintained when the Director approved the ACUP application. And that is the context under which the Commission undertook its review.

¶39 Still, the Resort urges us to make a decision based on the assumption that the proposed improvements would have no impact on parking. But that assumption never became the basis for a factual determination made by the Director, the Commission, or the district court. The Director never made a conclusion regarding the Resort's claims of no impact. And in reviewing the Director's decision, the Commission never made a conclusion regarding the Resort's claim of no impact. Instead, the Commission found that "the proposal did not meet" Criterion Six because "it [was] not possible to accurately assess the required parking and other mitigation measures" and because of other various defects in the Parking Mitigation Plan. In reviewing the Commission's decision, the district court likewise never made a conclusion regarding the Resort's claim of no impact.[6] In other

---

6. The Resort claims that the district court found there was "no non-speculative connection between a higher CCC number and a higher parking demand." But the Resort mischaracterizes this statement. This was not in any way a part of the district court's ruling. Rather, it was an off-hand comment—made *prior* to the ruling—when the district court said, "I think . . . you're on the high side of the argument of there's basis in the record here, no non-speculative connection between a higher CCC number and a higher parking demand. I'm persuaded by that." During the district court's actual oral ruling on the matter, the Resort confronted the court with this very issue, asking, "[W]hat evidence in the record [was there] that there would be any impact on parking caused by . . . the proposed two lift upgrades?" To that,

(continued…)

words, the district court and the Commission concluded that the Resort failed to show compliance with Criterion Six.

¶40 The assumption underlying each of the proceedings below was that the 2.5% increase in CCC would affect parking. The Resort never challenged the Director's conclusion that a Parking Mitigation Plan was required. Thus, the Commission and the district court properly considered the question that we now consider here—whether the Parking Mitigation Plan would sufficiently address the increase in parking demand.

¶41 Again, we will set aside the Commission's decision only if it was arbitrary and capricious, that is, if it was not supported by substantial evidence. Therefore, as long as the "quantum and quality of relevant evidence [was] adequate to convince a reasonable mind" that the Parking Mitigation Plan would not mitigate the parking impact caused by the proposed improvements, then the Commission's decision was neither arbitrary nor capricious. *See First Nat'l Bank of Boston v. County Board of Equalization*, 799 P.2d 1163, 1165 (Utah 1990). Based on our review of the record, we conclude that the evidence before the Commission was adequate to convince a reasonable mind that the Parking Mitigation Plan was insufficient and that Criterion Six therefore had not been met. As a result, the Resort was not entitled to obtain a conditional use permit through the ACUP process. The following reasons support this conclusion.

---

the district court responded, "That's a question for the [D]irector. [The Director] made that decision, and you didn't appeal it. But [the Director] found that [the Parking Mitigation Plan] was necessary and was the thing that mitigates the impact of the lift upgrades. That issue is not before me." More importantly, given that we are directly reviewing the Commission's decision, we would not be bound by the district court's finding if it ruled that the issue was properly before it.

¶42 First, the Commission found, "[T]he total operating CCC has not been verified and/or defined. As a result it is not possible to accurately assess the required parking and other mitigation measures." At the Commission's meeting where it considered the Intervenors' appeal, the Commission heard evidence from the Intervenors about discrepancies in the Resort's CCC calculations. Without clear CCC calculations, it is impossible to know whether the potential parking impact would increase by 2.5% or by something significantly greater. The discrepancies in the Resort's CCC calculations—and the unanswered questions about those calculations—were sufficient to convince a reasonable mind that the Parking Mitigation Plan did not constitute an "assurance" as required by Criterion Six.

¶43 Next, the Commission heard evidence that the additional parking at Park City High School might not mitigate parking impact in the way suggested by the Resort. The Resort's Parking Mitigation Plan stated that it would implement a paid parking reservation system and that if guests arrived without a reservation, they would be redirected to another parking location, like the high school. But at the public hearings, the Commission heard evidence from the Intervenors that parking at the high school was available a maximum of eight days per month and limited to weekends and holidays, not to include consecutive weekends. At the hearings, members of the community testified that skiers sometimes park illegally throughout the city when the current parking is insufficient. Indeed, a key assumption of the Parking Mitigation Plan is that overflow parking options would be sufficient to meet demand, but there was substantial evidence to suggest otherwise.

¶44 The Commission also heard evidence suggesting that the Parking Mitigation Plan was based on ski resort data that was not comparable to the situation in Park City. In its Parking Mitigation Plan, the Resort specifically references Beaver Creek and Alta. But at the hearing, the Intervenors suggested that Park City is

uniquely situated when compared to those two areas. For example, Park City attracts visitors not only for its world class skiing but also for tourism, shopping, and relaxation. While many skiers in Alta and Beaver Creek may be dropped off to ski, skiers in Park City are more likely to be accompanied by family and friends who want to take advantage of other local offerings and thus will still need parking spots. The Resort asserts that the anticipated 11% reduction in parking demand relies on "a proprietary model based on a meta-analysis of 50 different parking studies." But nothing in the record compels confidence that this study is based on parking situations that are comparable to Park City's, so it was well within the Commission's discretion to give it whatever weight—including no weight—the Commission felt it warranted. Accordingly, in this way the evidence was sufficient to convince a reasonable mind that the Parking Mitigation Plan was insufficient.

¶45    Finally, the Commission heard evidence that the reliability of the Parking Mitigation Plan was questionable given that it was not verified by Park City's expert or anyone other than the Resort and its experts. The record suggests that the Resort's Parking Mitigation Plan potentially contained inconsistencies or inaccurate predictions and that those calculations were never verified. With no verification from a third party, there is reason to believe that the numbers presented by the Resort do not accurately represent the possible parking mitigation proposed in the Parking Mitigation Plan. For example, the Resort's expert asserted, "[A]n 11% reduction in parking demand is achievable under a paid parking system at [the Resort]. . . . The anticipated potential reduction in demand will be achieved through an increase in vehicle occupancy and an increase in transit ridership." Thus, the Resort alleges that parking mitigation would be achieved, at least in part, by an increase in AVO (average vehicle occupancy). But this logic is not reflected in the math presented by the Resort. In its Parking Mitigation Plan, the Resort divides the total number of skiers requiring parking by 2.7,

because the Parking Mitigation Plan would allegedly increase AVO from 2.3 to 2.7. The Resort's math results in a lower number of vehicles requiring parking spots. Then the Resort subtracts 195 parking spaces from the total required parking spaces because of the 11% reduction in parking achieved by the Parking Mitigation Plan. But according to the Resort, that 11% reduction would happen *only because* of the increased AVO. Thus, at least as far as we can tell, the Resort may have double-counted the impact of the Parking Mitigation Plan, leading the Resort to conclude that it would sufficiently mitigate any parking impact.

¶46   In reviewing the totality of the available evidence, we cannot say that the proposed improvements would have no impact on parking when that fact was never seriously established or reviewed below. From our reading of the record, there was sufficient evidence presented to the Commission to convince a reasonable mind that the Parking Mitigation Plan did not mitigate the impact on parking that the proposed improvements might have had. Thus, the Commission's decision that Criterion Six was not met was supported by substantial evidence, so the decision was not arbitrary or capricious.

CONCLUSION

¶47   We agree with the district court that the Commission's decision was neither arbitrary or capricious, nor otherwise illegal, in determining that the Resort's ACUP application did not satisfy Criterion Six of the Development Agreement. Affirmed.

———————